ALTON RAILROAD CO. *v.* UNITED STATES ET AL.

No. 81. Argued October 10, 11, 1932.—Decided December 5, 1932.

230

*Mr. Frank H. Towner,* with whom *Mr. Silas H. Strawn* was on the brief, for appellant.

*Mr. J. Stanley Payne,* with whom *Solicitor General Thacher, Assistant to the Attorney General O'Brian,* and *Mr. Daniel W. Knowlton* were on the brief, for the United States and the Interstate Commerce Commission.

*Mr. Leo P. Day* appeared for the railroad companies, appellees.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This suit, under the Urgent Deficiencies Act of October 22, 1913, c. 32, 38 Stat. 208, 220, was brought by The Alton Railroad Company in the federal court for northern Illinois to set aside part of an order entered by the Interstate Commerce Commission under § 15 (6) of the Interstate Commerce Act, see Transportation Act, February 28, 1920, c. 91, § 418, 41 Stat. 456, 475, 486. The

defendants are the United States and, by intervention, the Commission and carriers adversely interested. The proceeding before the Commission was commenced by the receivers of the Chicago & Alton " to establish just, reasonable, and equitable divisions " of existing joint rates for grain and grain products from Peoria, Illinois, to points east of Buffalo.[1] The Commission found that the divisions of the so-called " local " rates were too low, and ordered them increased. It found that the divisions of the so-called " reshipping " rates were " not unjust, unreasonable or otherwise unlawful " and refused relief as to them. Wheelock v. Akron, Canton & Youngstown Ry. Co., 169 I. C. C. 594; 179 I. C. C. 517.[2] The Alton Railroad (the

[1] The proceedings before the Commission involved also the rates from Pekin, which lies about ten miles from Peoria. But as the inbound and outbound rates to and from these two points and the transit regulations and practices in effect are the same as to both, only Peoria will be referred to.

[2] Division 5 of the Commission, after a hearing, found that the share accorded the Alton was unreasonable and otherwise unlawful, and fixed new divisions. On petition by the defendants, the order of Division 5 was indefinitely postponed and a rehearing before the full Commission granted. The order entered by the full Commission reads as follows:

" This case having been reheard and submitted by the parties, and full investigation of the matters and things involved having been had, and the commission having, on the date hereof, made and filed a report on rehearing containing its findings of fact and conclusions thereon, which said report, together with the original report and order herein, 169 I. C. C. 594, is hereby referred to and made a part hereof; and the commission having found in said report on rehearing, (1) that just, reasonable, and equitable divisions to be received, respectively, by complainants herein and the defendant carriers east of Chicago, Joliet, or Dwight, Ill., out of the joint nontransit rates on grain, grain products, and grain by-products, in carloads, from Peoria and Pekin, Ill., via Chicago, Joliet, or Dwight, to destinations in eastern trunk-line and New England territories, east of Buffalo, N. Y., over the lines of complainants to Chicago, Joliet, or Dwight, will be the specific or arbitrary over the Chicago reshipping rate to

corporation which acquired the line under the reorganization, Alton R. Co. Acquisition and Stock Issue, 175 I. C. C. 301), insists that by so denying relief the Commission has, in view of the facts specifically found, subjected its property to confiscation; and on this ground seeks to have that part of the order set aside.

Lines of the Alton extend from Peoria to Chicago, Joliet and Dwight, Illinois and at each of those cities connect with railroads whose lines extend to the East. Peoria is an important market for grain received from the West and Northwest. At Peoria the grain goes into elevators. There it may be sold and resold or it may be manufactured into grain products and by-products. Much of the grain is later shipped from Peoria to the East in the form of grain products and by-products. The transportation of grain consigned to Peoria is completed, however, by the unloading of the cars there and the payment of charges. The carriers serving Peoria have not established joint rates from such points of origin of the grain

complainants and the reshipping rate from Chicago to destination to the carriers defendant east of Chicago; and (2) that the present divisions of joint reshipping or proportional rates on grain, grain products, and grain by-products, in carloads, from Peoria and Pekin over the lines of complainants to Chicago, Joliet, or Dwight, destined to points in eastern trunk-line and New England territories east of Buffalo, are not unjust, unreasonable, or otherwise unlawful as alleged by complainants:

" It is ordered that the aforementioned original order of November 28, 1930, be, and it is hereby, vacated and set aside.

" It is further ordered that the above-named defendants, according as they participate in the transportation, be, and they are hereby notified and required to cease and desist, on or before January 16, 1932, and thereafter to abstain from demanding, collecting, or receiving divisions of the joint nontransit rates specified in the preceding paragraph which do not allow said complainants the divisions found in said reports to be just, reasonable, and equitable.

"And it is further ordered that this order shall continue in force until the further order of the commission."

to the East, with a transit privilege at Peoria. Compare *Central R. Co. v. United States,* 257 U. S. 247. But the tariffs of outbound joint rates from Peoria to points east of Buffalo, voluntarily established by the Alton and connecting railroads, provide for a lower scale of rates applicable, under certain conditions, to grain and the products of grain which had a rail movement inbound from the territory referred to. This lower scale is called "reshipping" rates; and the merchandise shipped thereunder is called transit grain or grain products.[3] The higher scale applicable to other grain or grain products is called "local" rates. Compare *Atchison, Topeka & Santa Fe Ry. Co. v. United States,* 279 U. S. 768.

Until July 1, 1929, the divisions of both classes of rates were fixed by agreement of the Alton and the connecting lines. Then, the connecting lines, without the sanction of the Commission and over the protest of the Alton, reduced, for both classes of rates, the amounts paid to it as divisions. The connecting lines were and are physically in a position to deprive the Alton of a larger share by

---

[3] Reshipping rates from Peoria vary somewhat with the point of origin of the grain. A subsequent outbound shipment of grain or its products may be from a shipment which did not move inbound from the territory above referred to. But the shipper, in order to avail himself of the reshipping rates on outbound grain, grain products or by-products, must establish the fact that he sent an equivalent amount of like grain from the point of origin to Peoria within the twelve-month period allowed for transit privileges. This proof is made by the presentation of paid freight bills as memoranda of the inbound shipments. Compare Surrendered Tonnage Slips at Transit Points, 77 I. C. C. 239. The inbound and outbound shipments are carried under separate bills of lading; the final destination of the grain is usually undetermined at the time of the inbound shipment. In this respect the practice differs from that of through shipment with transit privileges. On the prevalence, legality, and possible abuses of both reshipping rates and through rates with transit privileges, see *Atchison, T. & S. F. Ry. Co. v. United States,* 279 U. S. 768, 777–780, and cases there cited.

reason of the fact that the freight is collected at the destinations and distributed by the collecting carrier. The haul on the Alton outbound from Peoria is from 82 to 155 miles, dependent upon the route selected. The divisions constitute the only revenue received by the Alton for the service performed by it under the "reshipping" rates. Under the reduced allowances the Alton does not receive on any shipment more than 2 cents per 100 pounds and on many shipments it receives nothing.[4] The Com-

---

[4] As stated in note 3, *supra*, the reshipping rates from Peoria to the East vary with the points of origin of the grain or grain product. Thus the reshipping rate from Peoria to New York on grain originating in the Northwest is 30.5 cents per 100 pounds, while that on grain originating in the Illinois-Iowa territory is 32.5 cents. On grain originating at other points the rates fall somewhere between these two figures. The outbound reshipping rate from Chicago to New York, with exceptions not material here, is 30.5 cents irrespective of the point of origin. The inbound rates to Chicago and to Peoria are the same on shipments from the Illinois-Iowa territory, but on shipments from the Northwest the inbound rate to Peoria is 2 cents less than to Chicago; and on shipments from other points the difference is less than 2 cents. It is evident that the outbound reshipping rates from Peoria, varying as they do with the point of origin of the grain, are designed to equalize the total rate from point of origin to final destination, whether Peoria or Chicago is taken as the place for utilizing transit privileges. Stated in general terms, where the rate to Peoria is less than that to Chicago, the rate from Peoria is correspondingly greater than that from Chicago. In no case is this excess of outbound rate from Peoria over that from Chicago more than 2 cents per 100 pounds; and in some cases there is no excess. It is this excess, if any exists, of the rate from Peoria over the 30.5 cent rate from Chicago that constitutes the share being paid to the Alton by the connecting lines out of the joint rate from Peoria to New York. The connecting carriers invariably retain 30.5 cents as their own share, leaving the Alton a maximum of 2 cents per 100 pounds as its allotment. In some instances—specifically, on shipments of grain whose origin was in the Northwest—the Alton receives nothing, although it may have hauled the grain over its line from Peoria 155 miles.

mission did not suggest that the divisions so received could be deemed compensatory for the outbound haul. It justified its conclusion that the divisions were not "unjust, unreasonable, or otherwise unlawful" on the ground that the transportation service for the performance of which the Alton sought increased divisions was not of importance to the public; and that if the Alton desired to participate in the transportation and was dissatisfied with the share allotted, it should secure in some way allowances from the carriers which bring the grain into Peoria.

The District Court, three judges sitting, did not consider the merits of the controversy. It dismissed the bill on the ground that the part of the order complained of was negative in character; and that hence the court was without jurisdiction. The case is here on direct appeal. Whether the order is a negative one within the meaning of the rule, compare *Procter & Gamble Co.* v. *United States,* 225 U. S. 282; *United States* v. *Los Angeles & Salt Lake R. Co.,* 273 U. S. 299, is the main question requiring decision. The Alton concedes that courts have ordinarily no power to review a finding of the Commission that a particular division is not unreasonable or inequitable. The Alton's contention is that while the joint rates are in force it is obliged to accept traffic under them; that until the Commission decides otherwise it is entitled to the divisions agreed upon when the joint rates were established; that the order of the Commission in approving the reduced allowance to the Alton made by the connecting carriers in effect established new divisions; and that since these are obviously confiscatory, the order is void.

*First.* The order while negative in form was, in effect, an affirmative one. The joint "reshipping" rates and the divisions thereof were established by agreement of the carriers participating in the transportation. The divisions were a term of that agreement. So long as the

joint rates voluntarily established remain in force, each carrier is entitled as of right to the division originally agreed upon, unless a readjustment of the divisions has been made either by the parties or by the Commission pursuant to the power conferred by paragraph 6 of § 15. The connecting carriers were legally without power to reduce the divisions of the Alton over its objection. If they deemed its divisions unreasonably large, they could have invoked the power of the Commission to make a reduction. Instead of applying to the Commission to adjust the existing divisions they resorted to force. Availing themselves of their strategic position as collectors of the freight, they withheld from the Alton a part of what was due it.

The Alton might have sued at law for the part of the divisions wrongfully withheld. *St. Louis S. W. Ry. Co. v. Bolinger & Co.*, 17 F. (2d) 924; compare *Malvern & F. V. R. Co. v. Chicago, R. I. & P. Ry. Co.*, 182 Fed. 685. But that was not its only remedy. Under § 15 (6) it was entitled to invoke the jurisdiction of the Commission.[5] It could, obviously, have applied to the Commission to have the agreed divisions increased; and, likewise, it was entitled to apply to secure a determination that the agreed divisions shall be maintained. The Commission was not at liberty to decline to exercise its jurisdiction. Paragraph 6 imposed upon it the obligation to act upon the complaint. Compare *New England Divisions Case*, 261 U. S.

[5] In its complaint to the Commission, the Alton charged that the divisions allotted to it were unjust and unreasonable and in violation of the Interstate Commerce Act, as amended. The Commission has held that it has no authority to enforce agreements for divisions, apart from a showing of such violation of the Act. Laona & Northern R. Co. *v.* Minneapolis, St. P. & S. Ste. M. Ry. Co., 52 I. C. C. 7; compare Morgantown & Wheeling Ry. Co. *v.* Pennsylvania R. Co., 63 I. C. C. 197. Section 208 (b) of Transportation Act, 1920, provides: "All divisions of joint rates, fares, or charges, which on February 29, 1920, are in effect between the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect

184; *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274. The Commission's finding that the Alton's divisions were " not unjust, unreasonable or otherwise unlawful," and the refusal of relief, had the effect of reducing the divisions which had been fixed by agreement of the parties and to which, but for the Commission's action, the Alton would have continued to be legally entitled.

*Second.* The jurisdiction of courts to review orders of the Commission is not dependent upon the form in which the order is couched. If the eastern carriers had applied to the Commission for a change in the divisions fixed by agreement, and the Commission had authorized divisions precisely like those which they are now imposing upon the Alton by their unauthorized action, the order would have been affirmative in form and would obviously have been subject to attack by the Alton in a suit in the federal court. By their unauthorized action the connecting carriers forced the Alton to become the moving party before the Commission, with the result that the Commission's approval of the divisions effected by them was expressed in the form of a refusal to interfere. This result of the alignment of parties does not endow the Commission's order with immunity from judicial review.

An order of the Commission which denies relief in part, or which dismisses the complaint, may be reviewed by a court. *Intermountain Rate Cases,* 234 U. S. 476, 490; *United States* v. *New River Co.*, 265 U. S. 533, 539–541.

---

until thereafter changed by mutual agreement between the interested carriers or by State or Federal authorities, respectively." The purpose of this provision, as stated by Chairman Esch of the House Committee on Interstate and Foreign Commerce, was to prevent rates and divisions from reverting, *ipso facto,* upon termination of federal control, to their pre-control status. See H. R. No. 456, 66th Cong., 1st Sess., p. 12; 58 Cong. Rec., p. 8314. The Commission has held that this provision did not confer authority upon it to enforce agreements for divisions. *Hampton & Branchville R. Co.* v. *Atlantic Coast Line R. Co.*, 88 I. C. C. 77, 84.

To annul the order would not, as in *Lehigh Valley R. Co.* v. *United States,* 243 U. S. 412, merely leave unchanged the very situation which the Commission's order refused to alter. Here the Alton, by virtue of the preëxisting agreement for divisions, would secure a measure of protection simply from the annulment of the order. To take jurisdiction would not be tantamount to usurpation by the court of the functions of the Commission. The court is not called upon here, as it was in *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 483, and *Standard Oil Co.* v. *United States,* 283 U. S. 235, 241, to afford relief which the Commission, in the exercise of its powers, had found that the complainant was not entitled to receive.[6] The court is not asked to prescribe reasonable divisions, or to

[6] Compare also *Procter & Gamble Co.* v. *United States,* 225 U. S. 282, in which the petition in the Commerce Court included a prayer that the defendant railroads be enjoined from collecting demurrage charges on the complainant's tank cars while on its own tracks—the relief which the Commission had refused to grant.

After the decision in the Procter & Gamble case, eleven cases pending in the Commerce Court were dismissed by it for want of jurisdiction. In five of these the Commission had refused to award reparation; in three it had refused to order the establishment of through routes and joint rates; in one it had refused both an award of reparation and the establishment of through routes and joint rates; in one it had dismissed a complaint challenging the lawfulness of rates; and in one it had dismissed a complaint attacking an advanced rate as unreasonable. See Twenty-sixth Ann. Rep. I. C. C., pp. 34, 202–205.

The Commission thus understood the import of the Procter & Gamble decision: "Its [this Court's] conclusion was that upon the plain reading of that statute the jurisdiction of the court was confined to restraining the operation of the orders of the Commission and that it possessed no affirmative authority to enforce the administrative provisions of that act. . . . The central thought to be gathered from this exposition of the law seems to be that the administrative judgment of the Commission, as expressed by its orders, can not be reviewed by the courts, in so far as they are within its delegated authority, not confiscatory, and not palpably arbitrary and unreasonable." *Id.,* pp. 24, 27.

direct that they be prescribed by the Commission.[7]  The court is asked to find that the Commission denied the Alton a constitutional right as a result of acting upon erroneous principles of law, and therefore to enjoin that part of the order.

The determination of the questions presented is properly within the scope of judicial review of the Commission's orders.  The questions are not the correctness of its conclusion as to the reasonableness of the divisions, or the correctness of its findings as to any of the factors which the Act directs it to consider in determining reasonableness.  The question is the correctness of the legal principles adopted by the Commission as a basis for reaching a conclusion from its findings.  The Commission reasoned that since the particular transportation services of the Alton here in question were not of importance to the public, and since the Alton was in substance an intermediate, not an originating carrier, it might be denied a compensatory share of the existing joint rates with the defendant carriers.  Whether the "importance to the public of the transportation services of such carriers," as specified in the Act, means the importance of the particular services in question, and whether a carrier not participating in joint rates with inbound roads is an "intermediate line" within the meaning of the section dealing with divisions, are questions upon which a court may properly pass.  So too is the more fundamental question whether, assuming the Commission was correct in its construction of the Act, it follows that a noncompensatory share of existing joint rates may be imposed.  Upon these questions the Alton was entitled to invoke the judg-

---

[7] Compare Hooker v. Knapp, 225 U. S. 302, in which a mandatory injunction was asked requiring the Commission to annul its order and reopen the case. The bill was dismissed on the authority of Procter & Gamble Co. v. United States, 225 U. S. 282. Compare also, Interstate Commerce Commission v. Waste Merchants Association, 260 U. S. 32,

ment of the court. Compare *Southern Ry. Co.* v. *St. Louis Hay Co.,* 214 U. S. 297, 301; *Southern Pacific Co.* v. *Interstate Commerce Commission,* 219 U. S. 433, 449.

*Third.* The defendants contend that what is sought to be enjoined is not an " order " within the meaning of the Urgent Deficiencies Act. That contention is unsound. The action of the Commission presents none of the characteristics which have led this Court in other cases to hold that there was want of jurisdiction. It is part of an order, compare *United States* v. *Atlanta, B. & C. R. Co.,* 282 U. S. 522, 527; and the order is final, not tentative. Compare *Delaware & Hudson Co.* v. *United States,* 266 U. S. 438, 448. It was entered as the result of a formal controversy, not a project of the Commission, compare *United States* v. *Los Angeles & Salt Lake R. Co.,* 273 U. S. 299; and it marked the disposition ` of the controversy, not a preliminary stage. Compare *United States* v. *Illinois Central R. Co.,* 244 U. S. 82.[8] The suit to enjoin the order is not premature. Compare *Piedmont & Northern Ry. Co.* v. *United States,* 280 U. S. 469. It subjects the Alton to damage which is substantial, immediate and irreparable. If the order is allowed to stand, and the eastern carriers continue to retain their present share of the joint rates, the Alton's only redress will be a subsequent complaint before the Commission. Even if the Commission should then decide that the existing divisions are unreasonable, it might be powerless to award reparation for the period from the entry of the present order. *Brimstone R. Co.* v. *United States,* 276 U. S. 104, 121.

The decree of the District Court dismissing the bill for want of jurisdiction is reversed, and the cause remanded to it for further proceedings.

*Reversed.*

---

[8] Compare also, *New York, O. & W. Ry. Co.* v. *United States,* 14 F. (2d) 850, affirmed *per curiam* 273 U. S. 652.