CHESAPEAKE & O. RY. CO. v. UNITED STATES et al.

District Court, E. D. Virginia.
Nov. 10, 1933.

M. Carter Hall, of Richmond, Va., and J. W. Reavis, of Cleveland, Ohio, for plaintiff.

Elmer B. Collins and Nelson Thomas, both of Washington, D. C., for defendants.

Before SOPER, Circuit Judge, and WAY and CHESNUT, District Judges.

SOPER, Circuit Judge.

This suit in equity was brought by the Chesapeake & Ohio Railway Company, hereinafter referred to as the carrier, under the provisions of the Act of October 22, 1913, c. 32, 38 Stat. 219 (28 USCA § 41 (28), and sections 43–48, inclusive), to enjoin, set aside, and annul certain rulings and orders of the Interstate Commerce Commission; and a court of three judges was accordingly organized to hear and determine it. The rulings and orders related to the proper method of accounting for expenditures of the carrier in rebuilding 2,390 70-ton hopper bottom gondola coal cars during the years 1926, 1927, and 1928. The expenditures for 1926 and 1927, aggregating $1,698,933.91 net, were originally charged to operating expenses on the books of the carrier, and those for 1928, amounting to $1,327,872.28 net, would have been so charged but for the first decision of the commission in this case, reported in 153 I. C. C.

9, which held that the expenditures for 1926 and 1927 should be accounted for in accordance with the requirements prescribed by the commission in its Classification of Investment in Road and Equipment of Steam Roads, issue of 1914, paragraph 9 of section 2 of the general instructions, relating to "additions," and hence should be charged to capital investment account.[1]

The carrier complied, under protest, reversing its charges for 1926 and 1927 and adopting, under like protest, the method of accounting required by the commission's first ruling, as to expenditures for 1928. A petition filed by the carrier for reopening and reconsideration of the case was denied by order of the commission on September 28, 1929, but on September 29, 1930, the commission reopened the proceeding upon its own motion and assigned it for further hearing. Much additional evidence was introduced by the carrier, and the entire matter was reconsidered in detail; but the commission reaffirmed its former decision; and the carrier brought this suit to enjoin the enforcement of the commission's orders. Answers have been filed by the United States and by the commission, which intervened as a party defendant in accordance with section 212 and section 213 of the Judicial Code, as amended (28 USCA § 45a).

The United States for a first defense moved that the petition be dismissed on the ground that the court was without jurisdiction to hear and determine the case under the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 219 (28 USCA §§ 41 to 48), by which jurisdiction is confined to cases wherein an order of the Interstate Commerce Commission is involved. It is contended by the United States that the Interstate Commerce

Commission has merely made reports or decisions in this controversy, and no order or compulsory mandate, and that therefore the point has not been reached in the proceeding before the commission at which the District Court is authorized to intervene. The facts bearing on this phase of the case are as follows:

The carrier in the first instance determined that the expenditures for work done on the cars were chargeable to operating expenses as maintenance of equipment, and made the entries upon its accounts accordingly, and reported this fact in its annual reports to the commission for the calendar years 1926 and 1927. Some time during the year 1928, the commission questioned the correctness of this accounting, and, after correspondence between the commission and the carrier, the director of the commission's bureau of accounts on June 12, 1928, notified the carrier that the matter had been given thorough consideration, and that the bureau of service had determined that the cars were new cars, and should be accounted for accordingly. The carrier was offered the opportunity for hearing before division 4 of the commission, in case the carrier should be unwilling to follow the ruling. The carrier being unwilling, a formal hearing was had as suggested on February 25, 1929. In the meantime, the carrier was in receipt of a letter of January 18, 1929, from a member of the commission in which it was directed to comply with the ruling, and adjust its accounts accordingly, and that such adjustment should also be made in its accounts for the year 1928. Thereafter on February 9, 1929, and after the formal hearing had been set, the carrier in pursuance to the requirements of the letters of June 12, 1928, and January 18, 1929, under protest, and in fear of the penalties imposed by section 20 (7) of the Interstate Commerce Act, as amended (49 USCA § 20 (7), reversed the entries and adjusted its books for the years in question to conform to said rulings and requirements, and made a report thereof to the commission in a letter of protest of February 9, 1929. Subsequently the hearing took place as arranged, and thereafter, to wit, on March 14, 1929, the commission filed a report wherein it held that the cars in question should have been treated as having been retired from the service and replaced with property of like purpose, and that the carrier's expenditures should be accounted for in accordance with the requirements of paragraph 9 of section 2 of the general instructions governing classification of investment in road and equipment

---

[1] "Additions are additional facilities, such as additional equipment, tracks (including timber and mine tracks), buildings, bridges, and other structures; additions to such facilities, such as extensions to tracks, buildings, and other structures; additional ties laid in existing tracks; and additional devices applied to facilities, such as air brakes applied to cars not previously thus equipped. When property, such as a section of road, track, unit of equipment, shop or power plant machine, building, or other structure, is retired from service and replaced with property of like purpose, the newly acquired property shall, for the purpose of this classification, be considered as an addition, and the cost thereof accounted for accordingly. (See Section 7). If, however, the property retired and replaced is of minor importance, such as a small roadway building or other structure, and is replaced in kind without betterment, the cost of the replacement shall be charged to Operating Expenses, and no adjustment made in the road and equipment accounts. * * * "Property retired means property which is sold, abandoned, demolished, or otherwise withdrawn from transportation service." (Exhibit No. 1, pp. 10–12).

above referred to. The commission declared in its report that no further order was deemed necessary at that time.

Thereafter, on June 22, 1929, the carrier filed a petition wherein it prayed the commission to reopen the proceeding for reconsideration upon the record as made, to grant argument before the full commission, and to set aside, annul, and withdraw the report of division 4 and find that the carrier's accounting was not unlawful. Upon this petition on September 28, 1929, a formal order was passed, wherein the commission, reciting that it had under consideration the record in the proceeding, and the petition for reconsideration, ordered that the petition be denied.

Thereafter, on September 29, 1930, division 4 of the commission, of its own motion, passed an order whereby it reopened the proceeding for the purpose of receiving evidence pertaining to the accounting, and directed that a further hearing be had. Evidence and exhibits were introduced by the carrier, which have been summarized in the findings of fact in this case, and thereafter, on December 13, 1932, division 4 issued its report and affirmed the decision and its former report of March 14, 1929. It declared that no further order was deemed necessary at that time.

The defendants contend that the commission has issued merely directory opinions, pointing out what the carrier was expected to do, rather than mandates, the disobedience of which would subject the carrier to punishment under section 20 (7) of the act for willful failure to keep its records in the manner approved by the commission. That punishment, it is said, could be based in this case only upon the failure of the carrier to observe the general instructions of the commission of 1914; and if a prosecution so based should be instituted, the carrier would have an opportunity to defend on the ground that under a proper interpretation of the general instructions, the expenditures involved were properly chargeable to operating expenses, rather than capital investment. Reliance is placed on United States v. Atlanta, Birmingham & Coast R. Co., 282 U. S. 522, 51 S. Ct. 237, 75 L. Ed. 513, where it was held that a passage in a report of the commission, which specified the maximum amount that a carrier might include in its accounts as representing an investment in a newly acquired road, and which notified the company that it would be expected to adjust its accounts accordingly, did not amount to an order of the commission so as to give jurisdiction to a District Court of three judges of a suit to annul the commis-

sion's act. We think, however, that the pending case more nearly resembles that considered in Alton R. Co. v. U. S., 287 U. S. 229, 53 S. Ct. 124, 77 L. Ed. 275, where it was held that a carrier illegally deprived of its share of joint rates fixed by an agreement between it and other carriers was entitled to apply to the commission for an order that the agreement of division be maintained; and that an order of the commission denying relief was in effect an order reducing the divisions to which the carrier was justly entitled, and conferred jurisdiction upon the District Court to hear and determine a suit to set it aside. In the pending case, the commission, through its agents, and through the report filed by division 4 on March 14, 1929, had declared the proper method of accounting and had directed the carrier to comply therewith; and thereafter the carrier prayed the commission to annul the report of division 4 and to find that the carrier's method of accounting was not unlawful. The response of the commission was a formal order denying the petition and declaring that no further order was deemed necessary. This order, although negative in form, was equivalent to a direction, and had the effect of a mandate, condemning the carrier's method of accounting and directing that the carrier keep its accounts in accordance with the instructions contained in the previous communications from members of the commission and in the reports of the commission itself. We conclude that the motion to dismiss the bill for lack of jurisdiction should be overruled.

The defendants also contend that the plaintiff has no standing to institute or maintain this suit, because the direction to the carrier to make additions to its capital investment does not of itself amount to an invasion of any legal right. The cases of Edward Hines Yellow Pine Trustees v. U. S., 263 U. S. 143, 44 S. Ct. 72, 68 L. Ed. 216, Alexander Sprunt & Son v. U. S., 281 U. S. 249, 50 S. Ct. 315, 74 L. Ed. 832, Pittsburgh & W. Va. Ry. v. U. S., 281 U. S. 479, 50 S. Ct. 378, 74 L. Ed. 980, and Moffat Tunnel League v. U. S., 289 U. S. 113, 119, 53 S. Ct. 543, 77 L. Ed. 1069, are cited in support of this view. But the problems involved in those cases are wholly different from any that may be said to arise in this. The Hines and Sprunt Cases hold simply that the loss of a competitive advantage, as the result of an order of the commission extending the rights of a rival, does not constitute a legal injury; the Pittsburgh & W. Va. Ry. Case merely that a railroad which was not affected by the order as carrier,

but only as stockholder of the carrier directly affected, had no greater legal interest than that of an ordinary stockholder, and hence an insufficient interest where the order had no effect upon its stock ownership; while the Moffat Case holds simply that civic and commercial associations devoted to the development of transportation facilities had at best a "sentiment" that the order there in question would adversely affect the development of transportation in their communities. In none of these cases did the order under consideration have any direct effect upon the party suing.

■ On its behalf the plaintiff says that it has suffered great legal injury through the increase of its income tax liability for the years 1926, 1927, and 1928, caused by the fact that it made its income tax returns on forms prescribed by the Commissioner of Internal Revenue which were in accordance with the accounting classifications prescribed by the commission. According to the returns, the taxable net income of the carrier for the years in question was increased by the sum of $2,024,389.54 and its income tax liability by the sum of $259,229.32. We do not think, however, that the carrier can base its standing in this court on this ground; for the Commissioner is not bound in his determinations by the rules of accounting enforced upon carriers by the Interstate Commerce Commission. In the case of Old Colony R. Co. v. Commissioner, 284 U. S. 552, 52 S. Ct. 211, 76 L. Ed. 484, the question was whether a corporation, which had issued its bonds at a premium received prior to the adoption of the Sixteenth Amendment, should treat the amount of the premium as income for the year in which it was received or should amortize it over the life of the bonds so that a portion of it would be included in the taxable income for each of the subsequent years. The court held that none of the premium was taxable income, as it had been received prior to the adoption of the Sixteenth Amendment; and, in so doing, rejected a contention of the Commissioner of Internal Revenue that the amounts amortized were taxable, because they were accounted for as income on the taxpayers' books under a method of bookkeeping adopted in accordance with the requirements of the Interstate Commerce Commission. The court said (page 562 of 284 U. S., 52 S. Ct. 211, 214, 76 L. Ed. 484):

"This position is inconsistent with the other arguments advanced. If the amortized premium is to be deducted from interest paid by the taxpayer it is not income. If it is income, then by hypothesis it is income received prior to the date of the Sixteenth Amendment, and not income which accrues to the taxpayer from year to year. Moreover, the rules of accounting enforced upon a carrier by the Interstate Commerce Commission are not binding upon the Commissioner; nor may he resort to the rules of that body, made for other purposes, for the determination of tax liability under the revenue acts."

See, also, Kansas City So. Ry. Co. v. Commissioner (C. C. A.) 52 F.(2d) 372.

■ However, the right of the carrier to maintain its present suit may be based on another ground. The order complained of requires the carrier to keep its accounts in a particular manner, and, in effect, if its contention is sound, denies it the right to maintain its equipment out of earnings, requires it artificially to inflate and enlarge its investment and decrease its income accounts, and keep its books upon an unreal and untrue basis. The only ground upon which it can be said that the carrier suffers no legal injury as a result of an order having such effect, is that mere accounting entries are involved and that, in the absence of immediate pecuniary or other damage, no legal injury can result. The law, however, is otherwise. The decisions recognize that the right to maintain a reasonable system of accounting is in itself a legal right the deprivation of which will entitle a carrier to relief, if it can show that the order complained of exceeds the commission's authority or is wholly arbitrary or unreasonable. See I. C. C. v. Goodrich Transit Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729; Kansas City So. Ry. Co. v. U. S., 231 U. S. 423, 34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1; also opinion below (Com. Ct.) 204 F. 641, 644; Norfolk & Western Ry. Co. v. U. S., 287 U. S. 134, 143, 53 S. Ct. 52, 77 L. Ed. 218. In these cases the courts took jurisdiction and reviewed on their merits orders requiring a particular method of accounting.

In Kansas City So. Ry. Co. v. United States, 231 U. S. 423, 34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1, it was held that a system of accounting prescribed by the commission for a carrier should be sustained, which permitted the carrier to carry into its property account only the excess of the cost of certain improvements made off its line after deducting the replacement cost of certain abandoned portions, and required the latter to be charged to operating expenses. The Supreme Court considered at length the reasonableness of the required accounting, and,

in discussing two of its prior decisions, stated the guiding rule as follows (page 447 of 231 U. S., 34 S. Ct. 125, 133, 58 L. Ed. 296): "In both cases it was recognized that in so complicated a matter as the construction, maintenance, and operation of a railroad line, it is difficult to define and perhaps more difficult to consistently apply a precise distinction between capital and expense accounts; and while the propriety of distributing improvement costs over a series of years was recognized, the impossibility of scientific accuracy in that regard was acknowledged. The question now is, whether the regulations of the Commission under attack do violence to these general principles,—rather, it is whether those regulations are so clearly contrary to these and other applicable principles that they should be set aside as being in excess of the powers conferred by Congress upon the Commission."

The reasons for the recognition of this right are well put by Judge Parker in the opinion of the District Court in the Norfolk & Western Case, 52 F. (2d) 967, 970: "But while we do not think that an accounting order such as this can be treated either as a binding classification of property in a rate-making or recapture proceeding or as a step in such proceedings, we cannot say that it imposes no burden or hardship furnishing ground for injunctive relief, if in fact it transcends the power of the commission or is so manifestly arbitrary and unreasonable as to evidence an abuse of discretion. Accounting under the order of the commission is not a mere matter of form, but one of substance. It sets forth the condition of public carriers for the information of their stock and bond-holders and the investing public as well as for that of the commission. It furnishes the basis of corporate financing, and many other matters affecting their very existence. They are entitled, therefore, not to be subjected to accounting orders which transcend the powers of the commission or which are arbitrary or unreasonable; and we have no doubt that, as against an accounting order which so offends, a carrier is entitled to relief by injunction. * * * "

The judgment of the District Court was approved on appeal and in its opinion (287 U. S. 134, 143, 53 S. Ct. 52, 55, 77 L. Ed. 218) the Supreme Court expressly said that while a carrier has no right to a particular form of accounting, "doubtless a Commission order under section 20 [of the Interstate Commerce Act] might be so arbitrary and outrageous as to call for correction."

The authority is conferred upon the commission by section 20 (1) and section 20 (5) of the Interstate Commerce Act, as amended (49 USCA § 20 (1, 5), to prescribe for carriers a uniform system of accounts and the manner in which they shall be kept; and from time to time the commission has promulgated classifications of investments in road and equipment and classifications of operating revenues and operating expenses. Prior to August 1, 1925, the so-called major portion rule was in effect under the commission's requirement set out in General Account II, Equipment, 5th paragraph of its Classification of Investment in Road and Equipment effective July 1, 1914 (Exhibit No. 1). This rule provided in effect that, if the cost of renewal, in the event of the reconstruction of a unit of equipment, should constitute the major portion of its value as renewed, the equipment, when taken out of service, should be considered as retired, and the renewed equipment should be considered an addition and the appraised cost thereof should be included in the account appropriate for the cost of equipment. There was great difficulty in the practical application of this rule largely attributable to the fact that the test was not only somewhat arbitrary but more or less subject to the control of the carriers, and consequently on August 1, 1925, the rule was eliminated from the classification by an order which also provided that thereafter all repairs of equipment should be charged to operating expenses. The later order, however, expressly provided that in the application of the rule due consideration must be given to the general instructions in the Classification of Investment in Road and Equipment (above quoted), which provide that when a unit of equipment is retired from service and replaced with property of a like purpose, the newly acquired property shall be considered as an addition and the cost thereof accounted for accordingly.

In the report of the commission in a proceeding entitled "Depreciation Charges of Steam Railroads," 118 I. C. C. 295, 348, there was some discussion of the proper method of accounting under the existing rule for the cost of extraordinary repairs in the rebuilding of equipment. Noting that the cost of replacements made to maintain continuous structures is chargeable to operating expenses and that the major portion rule had been repealed, the commission pointed out that now the cost of such extraordinary repairs or rebuilding of equipment is chargeable in all cases direct to operating expenses. However, in the final decision in the pending case sub-

sequently reported in 190 I. C. C. 382, the commission suggested that the passage quoted was in no way essential to the determination of the issue then before it, and added that while it had stated that the cost of extraordinary repairs or rebuilding of equipment is chargeable to operating expenses, it did not undertake to define the limits of ordinary repairs or rebuilding or to determine the circumstances which indicate that property has been retired from service.

The parties are agreed that it was correctly said in Parkersburg Iron & Steel Company v. Burnet (C. C. A.) 48 F.(2d) 163, that the question whether an outlay should be charged to expense or to investment as representing improvements is to be tested by the nature of the expenditure rather than by inquiring whether the value of the property was actually increased thereby. We must review in some detail the character and extent of the work done in the reconstruction of the cars, in order to determine whether the carrier is entitled to relief.

During the years 1926, 1927, and 1928, the carrier determined to rebuild 2,390 hopper-bottom gondola cars of 70-ton capacity then in a bad state of repair. 1,566 of these cars had been built in 1916 at a cost of $1,500, and 824 in 1917 at a cost of $2,000 each. The life of the body of such a car is from ten to eleven years. The body may be maintained by the renewal of the worn parts as they fail. The floors, hoppers, and doors are the first to wear out and the sides fail one year later. If the sound parts are renewed as they fail, the commission allows the cost to be charged to operating expenses. A more economical method in the opinion of the carrier is to keep the car in usable condition by minor repairs to the parts of the body first failing until all the major elements give out and then to provide a new body in one operation. The latter method was employed in this case.

Contracts were made between the carrier and certain car builders in the years 1926 and 1928. The contracts provided for the removing of the old bodies from the cars, cutting and loading scrap and other parts therefrom, making necessary repairs to the sets of trucks, building new bodies and putting them upon the repaired trucks. For the work of dismantling and loading scrap the cost was $56.-30 per car body; for work on the trucks, $17.05 per car set, and for building the new bodies and mounting them on the trucks, $1,-608.22 per car body under one contract, and $1,516.85 under another. The ledger value of the outshopped cars was $2,156 per car,

comprising cost of body of $1,394, value of reused material $573, cost of other materials $172, and labor on the trucks $17. The difference between the stated cost of the new body and the contract price is accounted for by the addition of certain betterments in the new bodies, less an allowance in price to the carrier by the manufacturer of the body steel.

The physical processes to which the cars were subjected under these contracts involved, as we have seen, the cutting of the bodies into scrap. Certain reusable air-brake parts were retained and used. The builders constructed new bodies of the same general type of those which had been scrapped and added certain improvements and betterments accounted for as such by the carriers at the average cost per car of $95. The new bodies were mounted upon trucks taken from the old cars and repaired and handled in the following manner: The trucks were placed upon a specially arranged track, the nonusable parts were removed, and necessary new or secondhand parts were introduced, the entire process consuming ordinarily not more than thirty minutes. The most important members of such trucks, approximating 90 per cent. of the cost, are the transverse beams carrying the car bodies, called "bolsters," the wheels, and the longitudinal members called "side frames." The wheels are the most expensive. 945 pairs or less than 10 per cent. of the total, were replaced; 280 were new; 221 consisted of secondhand axles and pairs of wheels and 440 of secondhand axles mounted on new wheels; 26 bolsters or about one-half of 1 per cent. of the total, were replaced; 1,593 side frames or less than 17 per cent., were replaced, most of which were new; 2,817 pairs of wheels with axles were sent to the carrier's shop for returning, at a cost of $1.04 for each car set, and an equal number were taken from the carrier's pool and sent to the builders and installed in the reconstructed trucks. There were also repairs to minor parts of the trucks, and replacements, and to the extent that they were replaced they were practically all new.

No attempt was made to preserve the former numbering of the cars. Each truck formerly bore the number of the car from which it was taken and could have been identified at any time before the new body was applied and the car was painted. No attempt was made to keep together the sets of trucks from the old cars so that the new bodies might be placed upon them. The trucks in fact were removed from the old bodies and stacked and taken for repairs into the truck shop in the order of convenience.

In appearance the outshopped cars differed from the inshopped cars in certain details, and 900 of the new bodies had a somewhat greater capacity and inside length; but the changes were not of great importance, and after the work was done the cars turned out were of substantially the same design, type, and capacity, and in the main possessed the same utility and essential qualities as transportation units as the cars received by the builders. In short, it may be fairly said that the outshopped cars were composed of new bodies, substantially similar to the old, mounted upon old trucks which had been repaired and renewed when necessary; no attempt being made to keep together the sets of trucks as they came from the inshopped cars.

The carrier contends that the amount which it should have been permitted to charge to operating expenses for maintenance of equipment on account of this work aggregates the sum of $3,026,806.19, after deductions for salvage and scrap, or an average charge of $1,266 per car. The commission required that the ledger value of the cars sent to the shop amounting to $4,042,790.74, or $1,692 per car, should be credited to the investment account; and that this amount should be balanced by charging accrued depreciation reserve in the sum of $1,140,180.26, or $477 per car, and the remainder $2,902,610.48, less salvage and scrap, amounting to $663,185.32, and the reused material amounting to $1,369,-795 to operating expenses and profit and loss, together with $133,318.40, the cost of dismantling. Thus, after certain adjustments, the net charge allowed to operating expenses and profit and loss representing service loss on the cars, was $1,002,948.56, and the investment account was increased by the sum of $883,674.30.

The carrier contends that the commission unlawfully deprived it of its property without due process of law in violation of the Fifth Amendment by denying its right to preserve the integrity of its investment through the maintenance of its equipment out of operating revenue. It relies on the well-known expression of the rule in Knoxville v. Water Company, 212 U. S. 1, 29 S. Ct. 148, 152, 53 L. Ed. 371, that a public utility "is entitled to earn a sufficient sum annually to provide not only for current repairs, but for making good the depreciation and replacing the parts of the property when they come to the end of their life." The recognition of this rule, however, does not solve the question raised in this case. It may be said in passing that the record in the case does not show that the carrier

has been denied the right referred to in such a manner as to result in actual financial loss, but aside from this consideration, and acknowledging the carrier's right to keep its accounts so as to show the expenses and losses to which it has been subjected through current repairs and depreciation of its property through use, we must still determine whether the expenditures in question were made for repairs or for the purchase of new equipment in place of old. In the one case, the amount expended would be properly chargeable as an operating expense, while in the other, the capital or investment account would be charged with the value of the new equipment and credited with the ledger value of that which was retired from service. Correct accounting, of course, would involve the allowance and the entry of adequate amounts for depreciation spread over the life of the units worn out in the service. Still we should be left with the question whether that which was done was the repair of old units or the construction of new.

Depreciation charges allowed by the commission are covered by the commission's Classification of Operating Revenue and Expenses effective July 1, 1914, Exhibit No. 2, where it is said (item 315, p. 63) "that the account shall include uniform monthly charges representing the depreciation of freight train cars." In other words, the allowance is designed to take care of the purchase price of the unit of equipment over its estimated life. The carrier admits that if a proper reserve for depreciation is set up or provided out of earnings, it is not entitled in addition to charge against operating revenues the expense of replacing parts of its property when they come to the end of their life; but the carrier says that it was not permitted by the commission, and it did not in effect set up a depreciation charge sufficient to cover the repairs or the reconditioning of its equipment.

The experience of the carrier in the case of 5,477 cars previously retired was that the average life of a car was 19.26 years. The life of the body of the car is 10 to 11 years. The depreciation charge adopted by the carrier upon the equipment in question began at the rate of 1½ per cent. which prevailed until June 30, 1916. Thereafter, during the period ending December 31, 1923, the rate of 2 per cent. was charged. During the year 1924, the rate of 3 per cent. was charged, and, after January 1, 1925, the rate of 4 per cent. was charged. Since even the highest figure indicated a service life for the cars of 25 years, it was manifestly inadequate, a fact

of which the carrier was well aware. The record affords no explanation as to why the carrier was content with this allowance, and why no effort was made, as in the pending case, to test the propriety of the allowance in the courts, so that it is reasonable to infer that the carrier deemed it to its best interests to maintain its investment account with as little deduction as possible. Nor does the carrier seek in this proceeding to correct its accounts so far as depreciation is concerned. It seeks only the right to charge to operating expenses a larger part of the costs of the reconstructed cars than the commission is willing to allow.

The carrier further contends that the action of the commission in compelling it in its accounts to treat the cars as retired from transportation service was arbitrary and without authority of law, because the cars were not retired and the required entries were therefore contrary to the actual facts. It is pointed out, as above stated, that the average life of a car is 19.26 years, and that only the bodies require renewal at the end of 10 or 11 years, so that in the present instance, the original units were kept in service by using the parts still serviceable, to wit, the trucks, as nuclei for the rebuilt or reconstructed units. Theoretical identity, it is argued, is not important, and in established railway practice, the disassembling and reassembling of a freight car for the purpose of replacing the body does not cause it to lose its identity even though certain parts are intermingled or exchanged. The commission itself does not require a carrier to keep the cost of repairs of individual cars.

The carrier objects to the finding of fact by the commission that the inshopped trucks were retired from service, and that the outshopped trucks constituted additions, and asserts that the cars were not retired at all, but merely supplied with new bodies mounted upon repaired trucks, with the result that this essential part of the unit of equipment remained in service. The car foreman of the carrier testified that the work on the trucks was done in the same manner and to the same extent as repair work is currently done by the carrier, in its own shops. So it is contended that there is no basis for the conclusion of the commission that although the outshopped trucks contained considerable amounts of reused and secondhand material, they were substantially rebuilt rather than repaired.

The precise question of accounting under the circumstances is whether it is correct to charge to investment account the cost of cars constructed with new bodies and with repaired and renewed trucks, and to credit to that account the ledger value of the units of equipment from which the trucks were salvaged. The carrier does not dispute the soundness of the commission's classification of investment, and in order to answer the question proposed in the light of this classification, it is necessary to decide whether the inshopped cars were demolished and retired from the service, although the trucks taken therefrom were repaired and reused. The commission made the ultimate finding of fact that such a retirement occurred, and it is perhaps a nice question to determine whether that finding is supported by substantial evidence and therefore binding on this court. We think, however, that it is not necessary to make the decision, for even if it be conceded that the commission's method of accounting was technically incorrect, we find no ground to conclude that the commission's position was arbitrary or unreasonable or productive of substantial injury to the carrier.

It is well settled that, if an attack upon the accounting methods prescribed by the commission is to be successful, it must rest at bottom upon a showing that they are so entirely at odds with fundamental principles of correct accounting as to manifest an abuse of power. So long as the commission acts fairly and reasonably within the granted power conferred by Congress, its orders are not subject to review. Kansas City Southern Ry. v. U. S., 231 U. S. 423, 444, 456; 34 S. Ct. 125, 58 L. Ed. 296, 52 L. R. A. (N. S.) 1; Norfolk & Western Ry. v. U. S., 287 U. S. 134, 141, 53 S. Ct. 52, 77 L. Ed. 218.

What the commission did in this case was to apply in effect the provisions of its old major portion rule to the peculiar circumstances before it. That rule was in effect from 1914 to 1925, and was applied, it is conceded, in the case of other cars belonging to the carrier rebuilt or repaired under circumstances similar to those in this case; but no record has been brought to our attention of a protest by this or any other carrier that its rights were jeopardized or impaired by the application of the rule. We do not apprehend such an unfavorable result in the present instance. When a car is placed in service with an entirely new body, provided at a cost that constitutes the major portion of the value of the renewed unit, and with secondhand trucks, reconstructed by repairs and renewals to a first-rate condition so that they may fairly be expected to last throughout the life of the new body, the unit of equipment so

closely approximates a new addition, that a system of accounting which so treats it can not be deemed arbitrary or unreasonable.

A decree will be signed dismissing the bill of complaint.