**DIAMOND TANK TRANSPORT, Inc., et al. v. UNITED STATES et al.**

**No. 1205.**

District Court, W. D. Washington, N. D. May 18, 1938.

Henry T. Ivers and George E. Flood, of Flood, Lenihan & Ivers, all of Seattle, Wash., for petitioners.

Elmer B. Collins, Sp. Asst. to the Atty. Gen., Robert H. Jackson, Asst. Atty. Gen., and J. Charles Dennis, U. S. Atty., of Seattle, Wash., for the United States.

E. M. Reidy and Daniel W. Knowlton, both of Washington, D. C., for Interstate Commerce Commission.

Carey, Hart, Spencer & McCulloch and L. W. Hobbs, all of Portland, Or., and Dean Eastman, Thomas H. Maguire, Edwin C. Matthias, and A. J. Clynch, all of Seattle, Wash. (Fletcher Rockwood, of Portland, Or., of counsel), for North Pacific Coast Freight Bureau.

Before HANEY, Circuit Judge, and CUSHMAN and BOWEN, District Judges.

HANEY, Circuit Judge.

An injunction against the use of rates published in a tariff filed with the Interstate Commerce Commission, and an adjudication that an order of the Commission is void, are sought by the bill presented to us.

The five petitioners are Washington corporations engaged in the business of transporting petroleum products in bulk, in intrastate and interstate commerce. The respondents named are the United States, the Commission and the North Pacific Coast Freight Bureau, hereinafter designated as the Bureau. The Bureau is an association of railroads, operating in intrastate and interstate commerce in Washington, Oregon and adjoining states, and published and filed on behalf of its members tariffs covering intrastate and interstate freight rates.

Prior to 1936, there was little, if any, effective regulation of truck service of oil in bulk in Washington and Oregon. Interstate rates by truck were filed April 1, 1936, pursuant to the Motor Carrier Act of 1935 (sections 201, 217, 49 Stat. 543, 560, 49 U.S.C.A. §§ 301, 317). The trucks with trailers haul loads ranging from 1,890 gallons to 6,000 gallons, and the average load is about 5,000 gallons. Most all of the rail tank cars have a capacity of 8,000 gallons and over.

On November 17, 1936, the Bureau filed with the Commission certain schedules adjusting rail rates by tank car. The proposed schedules established three sets of rates, to become effective December 20, 1936. Group 1 covered rates for refined petroleum products, and the schedules made no change in the prior existing rates in this group. Group 2 covered rates for such products in bulk, and fixed a minimum of 5,000 gallons, subject to the full shell capacity of the tank, and a maximum of 7,200 gallons. Previously existing rates were unchanged in this group. Group 3 covered rates for such products for loads with a minimum of 7,200 gallons, subject to the full shell capacity of the tank. The rates were 10% lower than those in Group 2. Previously there had been no division of rates on loads above 5,000 gallons.

Protests against the schedules were filed, and the Commission suspended such schedules as to interstate application. The schedules likewise were suspended as to their intrastate application by the Department of Public Service of Washington and the Public Utilities Commission of Oregon. The interstate and intrastate proceedings were heard jointly.

The Commission found among other things:

"* * * Undoubtedly, the effect of the dual minima will be to confine the traffic largely to movement in cars of 8,000-gallon capacity and larger, with a relatively small proportion of special types of refined oil, for which there is a limited demand, moving in tank cars of 5,000-gallon capacity or smaller."

Petitioners contended that the rates would discriminate against them because the maximum truck load limits under the state laws are 5,000 gallons in Oregon and 6,000 gallons in Washington, and they therefore could not compete with the Group 3 rates.

The Commission also found:

"The reasonableness of the proposed rates has been affirmatively established * * * It does not appear that the proposed schedules will result in unjust discrimination or undue prejudice or preference as between shipper-consignees using rail service. The question of what differential, if any, should be maintained between the rail and truck service is not in issue in this proceeding. If it were, it could not be determined on this record in the absence of any evidence as to the cost of service by truck. * * * But it is only

the lawfulness of the proposed schedules which the act authorizes us to consider * * *

"On this record, we find that the proposed interstate schedules have been justified."

On November 30, 1937 the Commission ordered "That the said order of December 18, 1936, be, and it is hereby, vacated and set aside as of December 13, 1937, and that this proceeding be discontinued."

Thereafter the bill was filed alleging the inability of petitioners to publish the Group 3 rates, that the uncontroverted evidence before the Commission was that the proposed rates would drive the truck operators out of business, and that the Commission, in making its order, disregarded such evidence and the provisions of the Motor Carrier Act of 1935, 49 U.S.C.A. § 301 et seq.

The Motor Carrier Act of 1935 (section 202, 49 U.S.C.A. § 302) provides in part:

"(a) It is hereby declared to be the policy of Congress to * * * improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers * * *."

On the merits, respondents maintain that the Commission failed to follow this mandate of "coordination". Compare: Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 288, 54 S.Ct. 692, 694, 78 L. Ed. 1260.

The first question before us is whether this court has jurisdiction of the suit. In United States v. Los Angeles & S. L. R. R., 273 U.S. 299, 309, 47 S.Ct. 413, 414, 71 L. Ed. 651, history concerning judicial action with regard to the Commission's orders, is set forth as follows:

"* * * For the first 19 years of the Commission's existence no order was * * * reviewable. The statutory jurisdiction to enjoin and set aside an order was granted in 1906, because then, for the first time, the rate-making power was conferred upon the Commission, and then disobedience of its orders was first made punishable. Hepburn Act June 29, 1906, c. 3591, §§ 2-7, 34 Stat. 584, 586–595. The first suit to set aside an order was brought soon after. Stickney v. Interstate Commerce Commission, C.C., 164 F. 638; Id., 215 U.S. 98, 30 S.Ct. 66, 54 L.Ed. 112. The jurisdiction conferred by the Hepburn Act was transferred, substantially unchanged, to the Commerce Court, by the Act of June 18, 1910, c. 309, § 1, 36 Stat. 539, and, when that court was abolished, to the District Courts by the Urgent Deficiencies Act [October 22, 1913, c. 32, 38 Stat. 208, 219] * * *."

Jurisdiction given to the district courts extended to "all cases for the enforcement * * * of any order of the Interstate Commerce Commission * * *" excepting particular things specified. 28 U.S.C.A. § 41(27). Jurisdiction was also extended to "cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission." 28 U.S.C.A. § 41(28). It is said that our jurisdiction has been invoked under the latter section.

It is apparent that not all the orders of the Commission are reviewable because of the nature of its various duties regarding which it was said in United States v. Atlanta, B. & C. R. Co., 282 U.S. 522, 527, 51 S.Ct. 237, 238, 239, 75 L.Ed. 513:

"* * * In some matters its duty is merely to investigate and to report facts. * * * In others, to make determinations. * * * In some, it acts in an advisory capacity. * * * In others in a supervisory. Even in the regulation of rates, as to which the Commission possesses mandatory power, it frequently seeks to secure the desired action without issuing a command. In such cases it customarily points out in its report what the carriers are expected to do. Such action is directory as distinguished from mandatory. No case has been found in which matter embodied in a report and not followed by a formal order has been held to be subject to judicial review. * * *"

Our jurisdiction "is not dependent upon the form in which the order is couched." Alton R. Co. v. United States, 287 U.S. 229, 237, 53 S.Ct. 124, 127, 77 L. Ed. 275, and see Powell v. United States, 300 U.S. 276, 285, 57 S.Ct. 470, 81 L.Ed. 643. Jurisdiction to set aside orders of the Commission extends to "those kinds of orders which there [is] jurisdiction to enforce." United States v. Griffin, 58 S.Ct. 601, 605, 82 L.Ed. ——, February 28, 1938; Procter & Gamble v. United States, 225 U. S. 282, 293, 294, 32 S.Ct. 761, 56 L.Ed. 1091. Such orders are "affirmative" ones—that is, those which grant relief sought. Tap Line Cases, U.S. v. Louisiana & P. R. Co., 234 U.S. 1, 34 S.Ct. 741, 58 L.Ed. 1185; Chicago Junction Case, 264 U.S. 258, 264, 44 S. Ct. 317, 319, 68 L.Ed. 667.

500

■ Although an order, taken by itself, denies relief sought, and is therefore "negative", (Shannahan v. United States, 58 S. Ct. 732, 82 L.Ed. ——, April 4, 1938), it may "in effect" grant relief, in which case it is an affirmative order. That rule was first applied in United States v. New River Co., 265 U.S. 533, 44 S.Ct. 610, 68 L.Ed. 1165, where there were two rules of car distribution; some shippers attacked the rule used by a carrier, and the Commission found such rule to be unreasonable, despite the fact that other shippers supported such rule; later the Commission reversed the finding and found the rule to be reasonable. It was held that the court had jurisdiction because, in effect, the order of the Commission granted the relief sought by the shippers, supporting the rule attacked.

Other applications of the rule were made in Alton R. Co. v. United States, 287 U.S. 229, 53 S.Ct. 124, 77 L.Ed. 275, and in Powell v. United States, supra. In the first a carrier sought an order compelling other carriers to maintain divisions agreed upon between them, and the order denying relief was held to be affirmative because it "had the effect of reducing the divisions which had been fixed by agreement." (Page 237, 53 S.Ct. page 127). In the latter case, an order striking a tariff from the Commission's files was held to be an "affirmative" order because it had the effect of preventing service in a locality by one carrier and permitted a contesting carrier to serve such locality.

■ On the other hand, an order which denies all relief is a "negative" order over which the court has no jurisdiction. Procter & Gamble v. United States, supra; Chicago Junction Case, supra. The following have been held to be negative orders: an order denying relief from rules regarding demurrage;[1] an order denying an application to reduce rates;[2] an order denying a petition for an extension of time;[3] an order fixing rates but failing to fix divisions, where the gravamen of the suit was such failure;[4] an order denying, on the merits, an application for a certificate of public convenience and necessity;[5] an order denying damages sought for overpayments by shipper;[6] an order dismissing a complaint for damages for unjust discrimination;[7] an order denying petition of carriers to revise a private contract;[8] and an order denying an application of a carrier for an increase in its compensation for carrying the mail.[9]

■ Where the Commission makes an order denying relief on the erroneous ground that it had no jurisdiction, the order cannot be reviewed under the statute quoted, the proper remedy being a mandamus proceeding;[10] but if the decision was on the merits, mandamus will not lie.[11]

We need not discuss the cases involving orders which take some affirmative action, but which relate to procedural or investigatory matters, where review may not be had either under the statute quoted,[12] or by mandamus.[13]

■■ Certain language from the Commis-

---

[1] Procter & Gamble v. United States, 225 U.S. 282, 32 S.Ct. 761, 56 L.Ed. 1091.

[2] Hooker v. Knapp, 225 U.S. 302, 32 S.Ct. 769, 56 L.Ed. 1099.

[3] Lehigh Valley R. R. Co. v. United States, 243 U.S. 412, 37 S.Ct. 397, 61 L.Ed. 819.

[4] Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831.

[5] Piedmont & Nor. Ry. v. United States, 280 U.S. 469, 50 S.Ct. 192, 74 L.Ed. 551.

[6] Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999; Alton R. Co. v. U. S., 287 U.S. 229, 53 S.Ct. 124, 77 L.Ed. 275.

[7] Interstate Commerce Comm. v. United States, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273; Terminal Warehouse v. Penn. R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827.

[8] United States ex rel. Chicago Great Western R. Co. v. I. C. C., 294 U.S. 50, 55 S.Ct. 326, 79 L.Ed. 752.

[9] United States v. Griffin, 58 S.Ct. 601, 82 L.Ed. ——, February 28, 1928.

[10] Interstate Commerce Comm. v. U. S. ex rel. Humboldt Steamship Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849; U. S. ex rel. Louisville Cement Co. v. I. C. C., 246 U.S. 638, 38 S.Ct. 408, 62 L.Ed. 914; U. S. ex rel. Kansas City So. Ry. v. I. C. C., 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517.

[11] Interstate Commerce Comm. v. Waste Merchants' Ass'n, 260 U.S. 32, 43 S.Ct. 6, 67 L.Ed. 112.

[12] United States v. Illinois Cent. R. R. Co., 244 U.S. 82, 37 S.Ct. 584, 61 L.Ed. 1007; United States v. Los Angeles R. R., 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651; United States v. Atlanta, B. & C. R. Co., 282 U.S. 522, 51 S.Ct. 237, 75 L.Ed. 513; Compare: United States v. Griffin, supra, note 9.

[13] Interstate Commerce Comm. v. New York, N. H. & H. R. Co., 287 U.S. 178, 53 S.Ct. 106, 77 L.Ed. 248; Interstate

sion's report would indicate that it did not decide the question, as to whether the rates discriminated against the truckers, because it had no jurisdiction to do so. If that was the actual ground of the decision, it is clear, we think, that we have no jurisdiction to review such decision here, because this is not a mandamus proceeding. Had the order been made under the Motor Carrier Act of 1935, the rule might be different. Section 205(h), 49 U.S.C.A. § 305(h). We believe, therefore, that we should consider the decision as being one on the merits—that is that the rates did not discriminate against the truckers.

The statute requires carriers "to establish * * * just and reasonable rates, fares, and charges" [49 U.S.C.A. § 1(4)], and to "file with the commission * * * schedules showing all the rates, fares, and charges for transportation." 49 U.S.C.A. § 6(1). "A carrier is entitled to initiate rates and, in this connection, to adopt such policy of rate-making as to it seems wise." United States v. Illinois Cent. R. R., 263 U.S. 515, 522, 44 S.Ct. 189, 192, 68 L.Ed. 417. The Commission may investigate such rates, either upon complaint or its own motion, and if it finds that such rates are "unjust or unreasonable or unjustly discriminatory * * * the commission is authorized and empowered to determine and prescribe what will be the just and reasonable * * * rates, fares, or charges, to be thereafter observed * * * ." 49 U.S.C.A. § 15(1).

Petitioners contend that the order in question should be considered as one, which, although negative in form, in effect granted the carriers relief which they sought. We believe such effect cannot be attributed to the order in question. The carriers had obtained their relief by filing their schedules. True, the Commission might deprive them of the benefit of the schedules, but it did not do so. There was nothing in the order capable of enforcement, and it granted the carriers no right whatever for.the statute was the source of the right questioned. We believe the order "being a refusal to change the existing status, was a 'negative' order" (United States v. Griffin, supra), and was of the same character as those considered in Hooker v. Knapp, 225 U.S. 302, 32 S.Ct. 769, 56 L.Ed. 1099; Interstate Commerce

Commerce Comm. v. United States, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273; United States ex rel. Chicago Great West-

Comm. v. United States, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273, and Terminal Warehouse v. Penn. R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827.

An order will be entered dismissing the bill for want of jurisdiction.

