UNITED STATES ex rel. CHICAGO GREAT WESTERN RAILROAD CO. et al. *v.* INTERSTATE COMMERCE COMMISSION et al.

No. 234. Argued December 13, 1934.—Decided January 7, 1935.

---

*Mr. Frank H. Towner,* with whom *Messrs. Ralph M. Shaw, S. W. Moore, F. H. Moore,* and *A. F. Smith* were on the brief, for petitioners.

*Mr. Daniel W. Knowlton,* with whom *Mr. E. M. Reidy* was on the brief, for the Interstate Commerce Commission.

*Mr. Samuel W. Sawyer* for the Kansas City Terminal Ry. Co., respondent.

*Messrs. Charles H. Woods, Jonathan C. Gibson, E. A. Boyd, Bruce Scott, Walter McFarland, W. F. Dickinson, W. F. Peter, J. M. Souby, Francis W. Clements,* and *H. H. Larimore* submitted for the Atchison, Topeka & Santa Fe Ry. Co. et al., respondents.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This cause calls for the application of familiar principles governing the issuance of the writ of mandamus. The petitioners urge that the courts below erred in denying the writ. For an understanding of the contention the circumstances out of which the litigation arose should be stated.

Prior to the year 1906 ten railroads entering Kansas City used a union depot. Two others, the Chicago Great Western and the Kansas City Southern (the petitioners),

used the station belonging to the latter. The union station was inadequate and there was agitation for better facilities. As a consequence the ten roads set about to acquire the necessary property and rights and to construct a new union terminal. The instrumentality created for the purpose was the respondent, the Kansas City Terminal Railway Company, a corporation organized by the railroads, for whose stock they subscribed in equal shares. This company acquired from the constituent roads and from others the property and franchises requisite to the construction of the terminal. In addition to the moneys subscribed for stock, the terminal company borrowed in excess of $50,000,000.

The financing and operation of the project were governed by an operating agreement between the railroads, the terminal company and a trustee, which provided, amongst other things, for the construction, maintenance and operation of the terminal and its use by the proprietary companies throughout a term of two hundred years; equal ownership of the terminal company's stock; the admittance of other railroads on equal terms as to ownership of stock and use of the property by consent of two-thirds of the participants not in default under the agreement; issuance and sale of the terminal company's bonds secured by mortgage on its property; payment by each proprietary road of an equal share of taxes and governmental charges of the company and of interest and principal of its mortgage indebtedness; payment of a defaulting railroad's share of these charges by the remaining proprietaries in equal shares; exclusion of any defaulting road from the use of the facilities; the sharing of expenses of maintenance and operation by the using companies in proportion to each one's use. The stock of the terminal company was deposited with a trustee, subject to a voting trust, to prevent its transfer to any one not a party to the operating agreement. The roads also assigned the operating agreement to the mortgage trustee as additional

security. In 1910 the petitioners became parties to the agreement pursuant to its provisions.

The appointment of receivers in 1915 for the Missouri, Kansas and Texas Railway Company, one of the proprietary railroads, was followed by foreclosure under its mortgages. The decree of sale in foreclosure permitted the purchaser to adopt or reject any executory contract of the debtor. The purchasers organized the Missouri, Kansas & Texas Railroad Company (hereinafter designated M., K. & T.) to take title to the property, and that company elected not to be bound by the operating agreement, with the result that it was without terminal facilities in Kansas City. Because of this lack it applied to the Interstate Commerce Commission pursuant to § 3 (4) of the Interstate Commerce Act [1] for an order granting it the right to use the terminal, conditioned on payment of compensation proportioned to use. A temporary order was issued, and the matter set for final hearing. Prior to the hearing all of the eleven remaining railroads, parties to the operating agreement, intervened. Those designated as the larger users of the terminal opposed the granting of the petition. Those termed the smaller users (including the petitioners in the present case) asked that if the prayer of the M., K. & T. should be granted they be afforded relief from the hardship and inequality of burden imposed upon them by the agreement, by revision of the existing arrangement so that they might thereafter make use of the terminal upon terms as favorable as might be granted the M., K. & T. They based their request upon §§ 3 (1) (3) (4) and 15 (a) of the Act to regulate commerce, as amended. A motion was made to strike the intervening petitions of the small users on various grounds, amongst them that the Commission had no power to make an order superseding, modifying, nullifying or reforming the operating contract.

---

[1] 49 U. S. C. § 3 (4).

The matter came on for hearing, evidence was presented, and the petitioners showed that their use of the terminal over a period of years had averaged less than 3 per cent. of the total use, while their contribution to the interest and taxes amounted to 8⅓ per cent. of the total. For example, in 1932 each of the twelve proprietary railroads paid approximately $200,000 on account of interest and taxes. If these charges had been divided on the basis of actual use some of the larger users would have paid approximately $600,000 and the petitioners only a little more than $50,000 each. The Commission's report indicates that the operating agreement is inequitable, since it calls for payments by the smaller lines in excess of benefits derived, and permits the larger lines to enjoy the use of the facilities at an expense, proportioned to use, much less than that imposed upon the smaller users.

The Commission filed its report and order November 10, 1925.[2] With respect to the relief sought by the M., K. & T. it developed there was pending in a federal court an action to determine the legality of that road's election to denounce the operating agreement. The Commission therefore withheld action, ordering that if the decision of the court should be that the new railroad had no right of abandonment the petition would, upon motion, be dismissed; but if the court should sustain the right of abrogation, the M., K. & T. might then move for an order granting it the use of the terminal upon an agreed compensation, and if no agreement could be reached, upon such terms as the Commission might fix. The intervening petitions of the smaller users were dismissed. So matters stood until the right of the M., K. & T. to reject the agreement had been judicially affirmed. Thereupon that company applied to the Commission for the ascertainment of the compensation it should pay for use of the terminal, and the small users, including the present

---

[2] 104 I. C. C. 203.

petitioners, presented petitions for rehearing upon the order of November, 1925, dismissing their interventions. These petitions were denied June 1, 1933, and the Commission proceeded to hear the case as one involving only the compensation to be paid by the M., K. & T. for use of the terminal. The petitioners then applied to the Supreme Court of the District of Columbia for a writ of mandamus directed to the Commission requiring it to vacate its orders of November, 1925, and June, 1933, with respect to the petitioners' interventions, and to hear and decide upon the merits the issues thereby raised. A rule to show cause issued, the Commission and certain interveners answered, the petitioners demurred to the answers, the court overruled the demurrers, and as the petitioners elected to stand thereon, dismissed the petitions. Upon appeal, the Court of Appeals of the District affirmed the judgment.[3] We granted a writ of certiorari.[4]

The petitioners rely principally upon paragraphs (1) (3) and (4) of § 3 of the Act. The paragraphs are quoted in the margin.[5] Their position is that if the M., K. & T.

---

[3] 63 App. D. C. 215; 71 F. (2d) 336.

[4] 293 U. S. 545.

[5] "(1) It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"(3) All carriers, engaged in the transportation of passengers or property, subject to the provisions of this chapter, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers or property to and from their several lines and those connecting therewith, and shall not discriminate in their rates, fares, and charges between such connecting lines, or unduly prejudice any such connecting

is granted the use of the terminal pursuant to § 3 (4) on a basis more favorable than that available to its predecessor and to the petitioners under the operating agreement, unlawful discrimination forbidden by § 3 will result; and further, that they are entitled to petition for the grant of use upon compensation to be fixed by the Commission under paragraph (4) although they are parties to the agreement fixing their rights in the terminal. The respondents, by their motion to dismiss, challenged the power of the Commission to grant the relief asked. That body thus stated the problem presented:

" Whether, then, Congress has or has not appropriately exerted its plenary power directly or through us is a question at the threshold of each case, and it remains here

line in the distribution of traffic that is not specifically routed by the shipper.

"(4) If the Commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, including main line track or tracks for a reasonable distance outside of such terminal, of any carrier, by another carrier or other carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings. Such compensation shall be paid or adequately secured before the enjoyment of the use may be commenced. If under this paragraph the use of such terminal facilities of any carrier is required to be given to another carrier or other carriers, and the carrier whose terminal facilities are required to be so used is not satisfied with the terms fixed for such use, or if the amount of compensation so fixed is not duly and promptly paid, the carrier whose terminal facilities have thus been required to be given to another carrier or other carriers shall be entitled to recover, by suit or action against such other carrier or carriers, proper damages for any injuries sustained by it as the result of compliance with such requirement, or just compensation for such use, or both, as the case may be." 49 U. S. C. § 3 (1), (3), (4).

to consider whether the particular power invoked by the interveners has been conferred upon us."

After a discussion of paragraph (4) the Commission concluded:

" The power and authority thus invoked are not conferred by the quoted paragraph."

With respect to paragraph (3) it was held that, as the charges in question were essentially capital charges, they have no relation direct or indirect to the interchange of traffic between the several lines using the terminal, as contemplated by this paragraph, and the Commission was without authority thereunder to make the requested order.

Referring to paragraph (1), which prohibits undue prejudice or preference as between particular persons, firms, corporations, or localities, or particular descriptions of traffic, the Commission said:

"Assuming, without now deciding, that the provisions of paragraph (1) are broad enough to embrace, as between the parties thereto, a joint terminal agreement into which all the lines have voluntarily entered and for which they are mutually responsible, the distribution of the charges here in question is not shown to fall within their condemnation. Those charges are distinctly capital charges, based upon the terminal property itself, not upon its use, in no sense assumed by or chargeable to the proprietary lines as compensation for uses they either do or may make, and are divided among the lines in the proportions of their equitable titles to or interests in the property. For their respective uses of the property the lines severally assume maintenance and operating expenses in corresponding proportions. This is not shown to be undue prejudice or preference or unjust discrimination. Each proprietary pays an equal share of the aggregate interest and taxes upon its equal share in the aggregate property."

A contention that the case came within the declaration of policy of § 15 (a), with respect to the adjustment of rates so that the carriers as a whole or by groups will under honest, efficient and economical management earn a fair return upon their railway property used in transportation, was answered by the Commission thus:

" Neither expressly nor by implication does the provision embrace a direct or indirect revision or reformation of any such contract, lawful in itself as far as appears, as that here in question; and we are unable to find the requisite power or authority in any other provision of the act."

The petitioners insist that under the plain terms of the Act the Commission had jurisdiction of their complaints, but refused to entertain them, and that mandamus is the appropriate remedy to compel a hearing and determination upon the merits. The respondents reply that the Act plainly confers no such jurisdiction, or at least that the matter is not so clear as to warrant interference by mandamus, and, in the alternative, that the Commission did take jurisdiction of the complaints and decide the merits. The Court of Appeals, without deciding whether the Act confers authority to grant the relief, held that the Commission in fact took jurisdiction, heard the cases, and decided as matter of law that it was without power or authority in the premises; that this constituted a decision which, whether right or wrong as matter of law, was impregnable to the writ of mandamus. We concur in the result reached, but for reasons differing somewhat from those announced by that court.

1. The language used by the Commission with respect to the application of paragraph (1) of § 3 of the Act lends color to the respondents' argument that upon consideration of the whole record the Commission reached the conclusion that the enforcement of the operating agreement against the petitioners while exempting the new applicant, the M., K. & T., from its terms, did not amount to dis-

crimination as defined by the Act. If this is a proper characterization of that body's action, no court can by mandamus compel it to alter its decision. Where judgment or discretion is reposed in an administrative agency and has by that agency been exercised, courts are powerless by the use of the writ to compel a different conclusion.[6] We are, however, of opinion that, fairly considered, the report does not bear the construction contended for, but shows the Commission, upon analysis of the complaint and the evidence, found that the Act did not confer authority to accord the relief demanded.

2. The petitioners insist that as they stated a case alleged to fall within the provisions of the Act, they were entitled to have the Commission consider the case as stated, and this right they were denied. They say the writ ought to issue to compel that body to hear and decide their case. The Court of Appeals, answering the contention, held that the Commission did in fact entertain the complaint, decided the cause, and even if it erred as matter of law in respect of its statutory power, cannot be coerced by mandamus to reverse its decision. The petitioners say that the fallacy in this reasoning is that whether the Commission refuses to receive a complaint, or upon receiving it entertains and grants a motion to dismiss for lack of jurisdiction, its action comes to the same thing, namely, a refusal of jurisdiction. We think that this is so. Whether an administrative tribunal refuses to hear, or upon a hearing determines that as a matter of law it lacks power to act, it is either correct in its conclusion or incorrect, and the question is whether, if it errs in refusing to act, it is compellable by mandamus to proceed.

---

[6] *Interstate Commerce Comm'n* v. *United States ex rel. Waste Merchants Ass'n*, 260 U. S. 32; *Interstate Commerce Comm'n* v. *United States*, 289 U. S. 385, 394. Compare *Wilbur* v. *United States*, 281 U. S. 206, 218.

3. If beyond peradventure the Act does not confer upon the Commission the power invoked by a complainant, the writ will not be granted.[7] If on the other hand power and authority are plainly found in the Act, and the Commission erroneously refuses to exercise such power and authority, mandamus is the appropriate remedy to compel that body to proceed and to hear the case upon the merits. The fact that the complaint has been heard and, after hearing, the Commission has refused to enter an order because in its opinion no authority for such action is conferred by the statute, will not avail with the courts to prevent mandamus to correct a plain error of the Commission in renouncing jurisdiction.[8]

4. The ultimate question, then, upon the answer to which the decision of this case must turn, is whether, in holding that the statute granted it no authority to act in the premises, the Commission was so plainly and palpably wrong as matter of law that the writ should issue. It is to be noted that the solution of this question does not depend upon whether in a proper case this court would reach the same conclusion as that of the Commission. If that body had taken jurisdiction and granted relief a remedy would have been available to the respondents by the filing of a bill in equity to set aside the order and to enjoin its enforcement.[9] Had the matter been thus presented it would have been incumbent upon the courts, however doubtful the question, to decide it. But the order here made was negative in form and substance,— the refusal of relief,—and the remedy by suit in equity

[7] *Interstate Commerce Comm'n* v. *Los Angeles,* 280 U. S. 52.

[8] *Interstate Commerce Comm'n* v. *United States,* 224 U. S. 474, 484; *Louisville Cement Co.* v. *Interstate Commerce Comm'n,* 246 U. S. 638, 642; *Kansas City Southern Ry. Co.* v. *Interstate Commerce Comm'n,* 252 U. S. 178, 187. Compare *Interstate Commerce Comm'n* v. *United States,* 289 U. S. 385, 393.

[9] U. S. C. Tit. 28, § 41 (28); §§ 43-47, inclusive.

was therefore not available to the petitioners.[10]  The absence of a remedy by suit or action to redress alleged error of an administrative body is not in itself sufficient to invoke the power of mandamus.  Not only must there be no such remedy, but it must appear that the administrative tribunal was plainly and palpably wrong in refusing to take jurisdiction.  Is this shown in the present instance?  We think not.  The Commission in a careful and painstaking review of the legislation defining its powers, professed itself unable to find a grant of authority to set aside commitments in the nature of capital charges for property owned and used by the carriers.  It adverted to the fact that paragraph (1) of § 3 of the Act was directed to discriminations, preference and prejudice in the performance of the duties of the carrier towards the public which dealt with them as carriers, and related particularly to rates, fares and charges, and that paragraph (3) was adopted to prevent discriminations and unfair practices as between carriers in interchange of freight and traffic.  The language now found in these paragraphs has remained without amendment since the adoption of the original Act in 1887.  It concluded that petitioners could not invoke the new paragraph (4) added to § 3 by the Transportation Act, 1920, because it was intended to give a right of use to one then having no such right in a terminal owned by another line, and was inapplicable to a case like the present, where the petitioners by their own voluntary agreement were entitled, and for many years had been entitled, to the use of a terminal of which they were in effect part owners.  The Commission found itself unable to hold that the broad policy declared by § 15 (a) so altered the meaning of § 3 as to change the nature of the discriminations and practices denounced by that section.  Its decision was not unanimous, certain of the members being of the opinion that power to grant the

---

[10] *Interstate Commerce Comm'n* v. *United States*, 289 U. S. 385, 388.

relief demanded could be spelled out of the Act reading it as a whole and as amended by the Transportation Act, 1920. This statement of the views of the Commission indicates that its conclusion was not so clearly erroneous as to call for the exercise of the extraordinary power involved in the issuance of mandamus. Where the matter is not beyond peradventure clear we have invariably refused the writ, even though the question were one of law as to the extent of the statutory power of an administrative officer or body.[11] We think this principle applicable in the present case, and that the courts below were right in refusing the writ.

The judgment is                                   *Affirmed.*

---

[11] *Reeside* v. *Walker,* 11 How. 272, 289; *International Contracting Co.* v. *Lamont,* 155 U. S. 303, 308; *Riverside Oil Co.* v. *Hitchcock,* 190 U. S. 316, 323; *Bates & Guild Co.* v. *Payne,* 194 U. S. 106, 108; *Ness* v. *Fisher,* 223 U. S. 683, 691; *Hall* v. *Payne,* 254 U. S. 343, 347; *Wilbur* v. *United States,* 281 U. S. 206, 219; *United States* v. *Wilbur,* 283 U. S. 414, 420; *Interstate Commerce Commission* v. *New York, N. H. & H. R. Co.,* 287 U. S. 178, 191, 203.