**EASTERN STATES PETROLEUM & CHEMICAL CORPORATION, Plaintiff,**

v.

**Charles J. WALKER, Sr., and C. M. Maier, Defendants.**

**Civ. A. No. 12682.**

United States District Court
S. D. Texas,
Houston Division.
Sept. 18, 1959.

Meyers & Batzell, E. J. Dryer, Washington, D. C., James R. Connor, Fulbright, Crooker, Freeman, Bates & Jaworski, W. N. Arnold, Jr., Houston, Tex., for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Donald B. MacGuineas, Atty., Dept. of Justice, Washington, D. C., William B. Butler, U. S. Atty., Houston, Tex., for defendants.

INGRAHAM, District Judge.

Plaintiff operates a petroleum refinery at Houston with a capacity of 60,000 barrels per day. It seeks to enjoin the Collector and Deputy Collector of Customs at Galveston and Houston, Texas, from refusing to permit plaintiff to import amounts of oil in excess of its import allocation under the Mandatory Oil Import Program promulgated by the President in Proclamation 3279, issued March 10, 1959 (24 F.R. 1781), 19 U.S.C.A. § 1352a note. Plaintiff also seeks a declaratory judgment that it is entitled to an import allocation larger than it received under the program and that the Oil Import Appeals Board wrongfully denied its appeal for an increased allocation.

The purpose and nature of, and the statutory authority for, the Mandatory Oil Import Program are fully set forth in this court's opinion issued September 18th in Texas American Asphalt Corporation v. Walker, 177 F.Supp. 315.

Under the Voluntary Oil Import Program [1] which was in effect prior to the mandatory program, plaintiff was given an import allocation of 18,300 barrels per day, based on estimates of its imports of crudes for the latter half of 1957 which it submitted to the Director of Defense Mobilization. In 1957 plaintiff petitioned the Administrator of the voluntary program to increase its allocation under that program to 22,800 barrels per day on the grounds (1) that plaintiff had made an error in failing to include in the figure which it submitted as its estimated imports for the latter half of 1957, 4,500 barrels per day of Wafra (Mid-East) crude which plaintiff was under contract to purchase but which it had theretofore been diverting to purchasers in Japan rather than importing into the United States, and (2) that plaintiff had a "barter contract" which obligated it to import crude in exchange for the export of gas oil.

After a hearing the Administrator of the voluntary program denied plaintiff's petition, on the grounds that the "Force Majeure" provision of plaintiff's Wafra crude contract might relieve it from liability if it did not import such crude and that the importation of the Wafra crude had not been programmed as an integral part of the operation of plaintiff's plant during the latter half of 1957. At plaintiff's request the Undersecretary of the Interior reviewed the Administrator's decision and upheld it in June 1958. The Undersecretary also denied plaintiff's claim that the gas oil which it exported in exchange for its imports of crude under the "barter contract" should be credited against its imports.

On June 21, 1958, plaintiff brought suit in the United States District Court for the District of Columbia against the Secretary of the Interior, the Secretary of Defense, and the Administrator of the voluntary program, challenging the validity of that program and seeking an injunction to restrain the defendants from enforcing the voluntary program against plaintiff by refusing to regard it as an eligible bidder on Government contracts for the purchase of petroleum products. That court denied a motion by plaintiff for a preliminary injunction and dismissed its complaint for failure to state a cause of action, holding that the voluntary program was authorized by the Buy-American Act (41 U.S.C.A. §§ 10(a)–10(d)). Eastern States Petroleum & Chemical Corp. v. Seaton, D.C.D.C., 163 F.Supp. 797. On appeal, the Court of Appeals for the District of Columbia Circuit reversed, holding that the complaint in that suit, in alleging arbitrary action by the defendants, stated a claim upon which relief could be granted and remanded the case to the District Court to afford the defendants in that action an opportunity to controvert the allegations of arbitrary action and to determine whether a preliminary injunction was warranted.

On remand the District Court again denied plaintiff's motion for a preliminary injunction, finding "that there was

1. See Executive Order 10761 (March 27, 1958, 23 F.R. 2067), 41 U.S.C.A. § 10d note.

ample evidence to sustain the administrator's determination" that the 1957 import estimate figures submitted by plaintiff "were an exercise of business judgment on the part of plaintiff" rather than an error, as plaintiff contended; that the "Force Majeure" clause of plaintiff's contract to import the Wafra crude "would relieve plaintiff of any hardship, beyond the loss of the profits of its purchases"; and concluded "that the plaintiff has not made a substantial showing of arbitrariness in the Administrator's action so as to warrant the granting of a preliminary injunction." Eastern States Petroleum & Chemical Corp. v. Seaton, D.C.D.C., 165 F.Supp. 363, 368, 369–370. Subsequently, the defendants in that action answered the complaint, denying that plaintiff is entitled to any relief.

That case is now at issue in the District Court for the District of Columbia. In June 1959 when it was called on the trial calendar, plaintiff requested and received a six-months continuance on the ground that if I should, in the suit before me, not uphold the administrative officials in their denial of plaintiff's application for an increased import quota under the mandatory program, the District of Columbia case "would then become moot."

Proclamation 3279 provides that with respect to the allocation of imports of crude oil and unfinished oils the implementing regulations to be issued thereunder by the Secretary of the Interior "may provide for distribution in such manner as to avoid drastic reductions below the last allocations under the Voluntary Oil Import Program." The Secretary's regulations issued March 13, 1959 (24 F.R. 1907), prescribe a formula by which eligible applicants are to be given allocations based on specified percentages of their refinery inputs for 1958 but provide that the minimum allocation given any applicant shall be 80% of his last allocation under the voluntary program.[2]

In accordance with these regulations, plaintiff was given an allocation of 12,-480 barrels per day for the initial allocation period under the mandatory program (March 11–June 30, 1959), which is 80% of plaintiff's last allocation under the preceding voluntary program.

Plaintiff filed an appeal with the Oil Import Appeals Board, established under Proclamation 3279 and the Secretary's regulations, seeking an increase of 12,685 barrels per day in its allocation. This appeal sought (1) an increase in the amount of 3,040 barrels per day "in order to correct an inadvertent error" in plaintiff's submission to the Director of Defense Mobilization of its estimates of imported crude for the latter half of 1957, which formed the basis for its allocation under the voluntary program; and (2) an increase in the amount of 9,645 barrels per day as the "quantity of petroleum re-exported" by plaintiff under its "barter agreement." Plaintiff also presented as an alternative basis for the increases it sought the "unusual hardship" which plaintiff would suffer as a result of its long-term ship and affreightment contracts.

After a hearing at which plaintiff submitted testimony, documentary evidence, and argument in support of its appeal, the Appeals Board denied plaintiff's appeal. With respect to the claim of alleged error in plaintiff's submission to the Director of Defense Mobilization of its estimates of imported crude for the latter half of 1957, which formed the basis for its allocation under the voluntary program, the Appeals Board ruled:

"* * * It is the view of the Board that it has no authority to correct errors directly related to the Voluntary Program, under which the Board had no functions. Accordingly, the request for relief based upon error is denied."

With respect to plaintiff's claim that its allocation should be increased by the

2. On June 6, 1959, the Secretary of the Interior issued revised regulations (24 F.R. 4654) which provide that the minimum allocation to any eligible applicant shall be 75.7% of his last allocation under the voluntary program.

"quantity of petroleum re-exported" by plaintiff under its "barter agreement" the Appeals Board ruled:

"The matter of crediting exports against imports was brought to the attention of the Under Secretary of the Interior by this same appellant under the Voluntary Oil Import Program and, in his decision of June 18, 1958, such arrangement was denied as a basis for adjustment under that program, affirming the decision of the Administrator, Voluntary Oil Import Program. The attention of the President's Special Committee to Investigate Crude Oil Imports was directed to this problem by this appellant prior to the mandatory adjustment program. However, neither Presidential Proclamation 3279 nor the Secretary's regulations implementing it specifically recognize such allowances. It is clear to the Board, therefore, that if barter arrangements were to be recognized as a means of extending allocations, the regulations of the Secretary would have made specific allowance for them."

With respect to plaintiff's alternative ground for an increase in its allotment because of the "unusual hardship" which it allegedly would suffer as a result of its long-term ship and affreightment contracts, the Appeals Board ruled:

"The Board is of a similar view regarding contracts, of whatever nature, outstanding when the mandatory program was promulgated, as a basis for modifying an oil import allocation. Actually, request for relief from contract commitments is viewed by the Board as a remote basis for supporting an increased oil allocation, since the relief sought really is from the obligations under a contract, which involves questions of defenses to the obligations, such

as force majeure, money damages, mitigation of damages, and other matters of contract law. In this perspective, the Board finds the problem to be beyond the scope of its authority."

In this action plaintiff does not challenge the validity of Proclamation 3279 or of the implementing regulations issued by the Secretary of the Interior.[3] The only defendants in this action are the Collector and Deputy Collector of Customs at Houston. They have nothing to do with the administration of the Mandatory Oil Import Program except to see to it that oil is imported into this country only under a license granted by the Secretary of the Interior or his subordinates to whom he has delegated that authority.

For the court to issue an injunction against defendants which would enable plaintiff to import oil in amounts in excess of its license and allocation would be to nullify and invalidate the unchallenged requirement of the Proclamation that after March 11, 1959, no crude oil or unfinished oils may be entered for consumption or withdrawn from warehouse for consumption except (1) by or for the account of a person to whom a license has been issued by the Secretary of the Interior pursuant to an allocation made to such person by the Secretary in accordance with regulations issued by the Secretary, and such entries and withdrawals may be made only in accordance with the terms of such license * * *." Accordingly, any relief which this court can grant must be consonant with that provision of the Proclamation.

As pointed out in my opinion in the Texas American case, this court has no authority to grant plaintiff an increased import allocation or license. That is an administrative, not a judicial, function. Even if the members of the Appeals Board were before me in this case, I could at most determine whether

3. Plaintiff's trial brief states that its action "is not an attack on the Mandatory Oil Import Program, but seeks only a simple adjustment in allocation as provided for by the Program. * * * It presents for review the decision of the Oil Import Appeals Board * * * refusing to modify Eastern States' allocation of crude oil as set by the Administrator. * * *"

they have committed an error of law in rendering their decision and, if I were to conclude that they had erred, remand the case to the Appeals Board for reconsideration in the light of my ruling.[4] My Texas-American opinion cites the controlling decisions of the Supreme Court on this point.

■ Since plaintiff may not under the Proclamation lawfully import oil in excess of its present allocation unless it can obtain an increased allocation from the Appeals Board, the members of that Board are indispensable parties and in their absence this suit cannot be maintained.[5] In this respect this case is the same as the Texas American case. As pointed out in my opinion in that case, the controlling authority is Gnerich v. Rutter, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068, and Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95, upon which plaintiff places its chief reliance, is distinguishable.

Accordingly, since plaintiff cannot lawfully import oil in excess of its present allocation and license without obtaining an increased allocation from the Appeals Board, its members are indispensable parties and this action must be dismissed for failure to join them.

Since it appears likely that an appeal will be taken in this case, I shall discuss the other issues presented by the parties even though I am dismissing this action for lack of indispensable parties, in order that the Court of Appeals may have the benefit of my views in the event it should hold that there is not a lack of indispensable parties.

■ In view of the fact that plaintiff can litigate in the suit which it has pending in the District Court for the District of Columbia the issue as to its right to an increase in its import allocation, I should dismiss this action and remit plaintiff to its remedy in the District of Columbia even if there were not a lack of indispensable parties here. If plaintiff can establish in its District of Columbia action that it is entitled to an increase in its allocation under the former voluntary program, it would then be entitled to a corresponding increase in its allocation under the mandatory program, since the regulations, as now revised, provide that the minimum allocation to any eligible applicant shall be 75.7% of his last allocation under the voluntary program. The grounds on which plaintiff seeks an increase in its allocation under the voluntary program in the District of Columbia are essentially the same as those on which it seeks an increase in its allocation under the mandatory program in this action. Rule 15(d), F.R. Civ.P., 28 U.S.C.A., permits plaintiff to amend its complaint in the District of Columbia suit to plead its claimed rights under the mandatory program.

■ In my opinion the efficient administration of justice in the federal courts does not permit a litigant to maintain two suits involving the same controversy in two district courts, absent a showing of necessity therefor. See Pacific Gas & Electric Co. v. Federal Power Commission, 9 Cir., 253 F.2d 536; Hammett v. Warner Brothers Pictures, Inc., 2 Cir., 176 F.2d 145, 150; American Automobile Ins. Co. v. Freundt, 7 Cir., 103 F.2d 613; Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321; Brillhart v. Excess Ins. Co., 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620; Hicks v. National Labor Relations Board, 4 Cir., 100 F.2d 804; Standard Oil Co. v. National Labor Relations Board, 8 Cir., 114 F.2d 743. Plaintiff does not make out any good reason for maintaining this action

4. Since the members of the Appeals Board are not parties to this action and are suable only in the District of Columbia, I could not direct them to increase plaintiff's import allocation even if I were to determine that plaintiff is entitled to such an increase. Blackmar v. Guerre, 342 U.S. 512, 515-516, 72 S.Ct. 410, 96 L. Ed. 534.

5. Under the Proclamation and regulations, the Appeals Board "may, on grounds of hardship, error, or other relevant special consideration * * * (1) modify any allocation made to any person under this regulation * * *."

concurrently with its suit in the District of Columbia. Indeed, in the light of the adverse rulings it has received in that suit, it would seem that its action in bringing a second suit in this district may properly be characterized as "forum shopping".

Accordingly, quite apart from the fact that there is a lack of indispensable parties to this suit, I would, as a matter of discretion, dismiss this action and leave plaintiff to its remedy in the District of Columbia suit.[6]

■ In its decision, the Appeals Board assumed the correctness of the facts asserted by plaintiff but dismissed its appeal on the ground that on those assumed facts the Board had no authority to grant plaintiff an increase in its allocation. This ruling represents an administrative interpretation of the provisions of the Proclamation and the regulations setting forth the circumstances in which the Appeals Board is empowered to modify allocations. I should accept that construction unless it is shown to be clearly erroneous. Federal Trade Commission v. Mandel Bros., Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893; Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 90, 79 S. Ct. 141, 3 L.Ed.2d 132; United States v. American Trucking Associations, 310 U. S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345.

■ The Appeals Board's conclusion that it was not vested with authority to correct errors allegedly occurring under the prior voluntary program does not appear to be unreasonable, particularly

since plaintiff itself, in filing its suit in the District Court for the District of Columbia, decided that that court is the appropriate forum for the correction of the Board's claimed error.

■ The Appeals Board's ruling that it could not increase plaintiff's allocation by the amount of diesel oil which it was obligated to deliver under its "barter agreement" with Anglo-Iranian Oil Company in exchange for Kuwait crude [7] was predicated on the fact that neither the Proclamation nor the regulations specifically provide for crediting exports of petroleum products under barter agreements against allocations. The Appeals Board was of the view that if such "barter arrangements were to be recognized as a means of extending allocations" the regulations would have specifically so provided. In view of the fact that plaintiff's barter agreement was brought to the attention of the cabinet committee which recommended the mandatory program to the President, but the committee in its report to the President made no recommendation that exports of petroleum products under barter agreements be credited against import allocations, the Board's conclusion does not appear unreasonable.

■ Nor has plaintiff shown that the Appeals Board was clearly wrong in its interpretation of the Proclamation and regulations as not granting it authority to give refiners "relief from contract commitments."

■ Furthermore, even if I were of the opinion that the Appeals Board's in-

---

6. The fact that the defendants in this suit are different from those in the District of Columbia suit is immaterial, since both sets of defendants are Government officials and a judgment against the defendants in the District of Columbia suit would be res judicata as to the defendants in this suit. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402–403, 60 S.Ct. 907, 84 L.Ed. 1263.

7. Under plaintiff's "barter agreement" with Anglo-Iranian Oil Company, entered into in 1954, plaintiff agreed to purchase Kuwait crude from Anglo-Iranian and in exchange therefor to deliver diesel oil to

Anglo-Iranian for export by that company. The exchange was to be at the rate of 408 barrels of diesel oil for each 1,000 barrels of Kuwait crude imported by plaintiff. Plaintiff was to take delivery of the Kuwait crude f. o. b. a specified point in Kuwait, and Anglo-Iranian was to take delivery of the diesel oil f. o. b. Houston. The agreement contained a "Force Majeure" provision that neither party should be liable for any breach which "arises from any cause reasonably beyond (its) control * * *." Any dispute between the parties was to be referred to arbitrators.

terpretation of its own authority was erroneous, I could not grant plaintiff the increase in its allocation which it seeks. The regulations, in providing that the Appeals Board "may" modify any allocation "on grounds of hardship, error, or other relevant special consideration," clearly vested the Appeals Board with discretion to determine whether the facts in a particular case warrant an increase in a refiner's allocation and, if so, what the amount of any such increase should be, in the light of the objectives of the program. Congress, the President, and the Secretary have delegated to the Appeals Board, not to the courts, the responsibility for making such discretionary judgments. For me to pass on the merits of plaintiff's appeal, without even the benefit of the Appeals Board's views, would be to usurp an administrative function. The authorities on this point are set forth in my decision in the Texas-American case.

I could, if the Appeals Board members were parties to this suit, decide whether or not the Board has jurisdiction to pass on plaintiff's appeal and, if I concluded that it did, direct its members to assume jurisdiction of that appeal. I could not, however, direct the Board how to decide the merits of the appeal. Still less could I undertake to make that decision myself. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 2 L.Ed.2d 788; United States ex rel. Chicago Great Western R. Co. v. Interstate Commerce Commission, 294 U.S. 50, 60–61, 55 S.Ct. 326, 79 L.Ed. 752; Work v. United States ex rel. Rives, 267 U.S. 175, 184, 45 S.Ct. 252, 69 L.Ed. 561; United States ex rel. Louisville Cement Co. v. Interstate Commerce Commission, 246 U.S. 638, 643, 645, 38 S.Ct. 408, 62 L.Ed. 914; Interstate Commerce Commission v. United States ex rel. Humboldt Steamship Company, 224 U.S. 474, 485, 32 S. Ct. 556, 56 L.Ed. 849.

Plaintiff's contention that its importation of crude under its barter agreement does not adversely affect the national security objectives of the mandatory program does not present a justiciable issue. The President issued Proclamation 3279 without providing for offsetting exports against gross imports. I have no authority to substitute my judgment for that of the President that the importation of crude in such circumstances will adversely affect the objective of the statute under which the Proclamation was issued. I must apply the Proclamation as it is written. Denver Union Stockyard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 289, 78 S.Ct. 738, 2 L.Ed.2d 771. Plaintiff's remedy is before Congress or the President, not before the courts. Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271; American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 118, 67 S.Ct. 133, 91 L.Ed. 103; National Broadcasting Co. v. United States, 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 394, 60 S.Ct. 907, 84 L.Ed. 1263.

This opinion shall constitute the court's findings of fact and conclusions of law.

True copies hereof shall be forwarded by the clerk to the attorneys of record, who will draft and submit judgment accordingly.