**NORTH CAROLINA NATURAL GAS CORPORATION, Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 2360.**

United States District Court
D. Delaware,
at Wilmington.
Nov. 27, 1961.

James M. Tunnell, Jr., and George T. Coulson (Morris, Nichols, Arsht & Tunnell) Wilmington, Del., and William J. Grove (Dow, Lohnes & Albertson) Washington, D. C., for plaintiff,

Leonard G. Hagner, U. S. Atty., Wilmington, Del., for defendant the United States.

H. Neil Garson, Washington, D. C., Assoc. Gen. Counsel for Interstate Commerce Commission.

Joseph L. Lenihan, Louisville, Ky., for Louisville & Nashville Railroad Co., et al., intervenors, and on the Briefs for Clinchfield Railroad Co., Atlantic Coast Line Railroad Co., Norfolk & Western Railway Co., Seaboard Airline Railroad Co., Piedmont & Northern Ry. Co., The Chesapeake & Ohio Ry. Co., The Cincinnati, New Orleans & Texas Ry. Company, Interstate Railroad Company, Southern Ry. Co., and Carolina Power & Light Co.

Henry J. Karison, and Earl E. Eisenhart, Jr., Washington, D. C., for Southern Ry. Co., intervenor.

Homer S. Carpenter (Rice, Carpenter & Carraway) Washington, D. C., for Property Owners Committee and Assoc. of Coal Mine Operators, intervenor.

Charles F. Rouse, Raleigh, N. C., for Carolina Power & Light Co., intervenor.

GOODRICH, Circuit Judge, and RODNEY and LEAHY, Senior District Judges.

LEAHY, Senior District Judge.

North Carolina Natural Gas Corporation filed suit under § 17(9) of the Interstate Commerce Act, 49 U.S.C.A. § 17(9), to review certain orders of the Interstate Commerce Commission. This Court has jurisdiction under the Act and under 28 U.S.C. §§ 1336, 2284, 2321–2325, and the complaint is properly before this Court under 28 U.S.C. § 1398 in that plaintiff is a Delaware corporation.

The orders of the ICC complained of failed to hold unlawful certain Tariffs providing special reduced rail transportation rates on bituminous fine coal from points of origin in Kentucky, Tennessee, West Virginia and Virginia to various destination points in the South including North Carolina. The legal challenge is to the Tariffs which provide preferred rates—agreed upon by the shipper-transporter and assignee—of 25¢ per ton per carload less to a consignee who, in the 12-month period ending the last day of the second month preceding delivery, has received a prescribed aggregate minimum volume. Such rates are less than the regularly published rates applicable to a consignee who has not received such minimum volume. The complaint avers the special reduced rates were calculated to enable delivered cost of bituminous coal to compete with natural gas in the Carolina territory.

Plaintiff, North Carolina Natural Gas, has since October 1, 1959, distributed and sold natural gas to domestic, commercial and industrial consumers within the service area; and has distributed and sold wholesale to other private and municipal distribution companies. Southern Freight Tariff Bureau filed the chal-

lenged Tariffs [1] which were not rejected by the Commission and the rates established were permitted to become effective on March 1, 1960, as legally filed rates.

The administrative process commenced on January 27, 1960 when the railroads, here involved, acting through the Southern Freight Tariff Bureau, filed with the ICC Freight Tariff 903.[2] On March 1, 1960 [specifically, on February 18, 1960] four railroads [3] petitioned the Commission to suspend the effective date of the rates and to enter upon an investigation as to the lawfulness under § 15(7) of the Act, 49 U.S.C.A. § 15(7). The objection questioned the competitive necessity for some of the reductions. Atlantic Coast Line Railroad Company and four other railroads [4] filed reply on February 24, 1960 to petition for suspension. It stated the reduced rates were necessary if the railroads were to retain the business of moving coal to certain electrical generating plants in the Carolina area.

Upon consideration of the petition for suspension and the reply, the ICC, through its Board of Suspension, issued its February 25, 1960 order instituting an investigation into the lawfulness of the rates. The rates were not suspended,[5] and protestants appealed the action [6] of the Suspension Board to Division 2 of the ICC. On February 29, 1960, Division 2 sustained the action of the Suspension Board in refusing to suspend the rates and in instituting an investigation of them.[7] The rates therefore became effective March 1, 1960.

On August 25, 1960 the railroads then petitioned the ICC to discontinue the investigation, stating that "after further consideration of the competitive conditions existing in Carolina territory they [the railroads] are convinced that the volume and multiple-car rate reductions on fine coal presently in effect but under investigation are warranted." It was after this that plaintiff, North Carolina Natural Gas, claiming to be adversely affected by the February 25, 1960 action of the Commission, on September 23, 1960 filed with the ICC a motion to expunge the filed Tariffs and to terminate the proceedings in Docket No. 33360 as to the Tariffs and rates contained therein. ICC, Division 2, by order on January

1. Jan. 27, 1960: SFTB Tariff 903, SFA ICC S-96 to be effective March 1, 1960. See, Item 215 (p. 13); Supplement 1 issued Feb. 16, 1960, adding Item 215-A; Supplement 2 issued Feb. 23, 1960; Supplement 3, issued Feb. 23, 1960, cancelling Supplement 2 and changing the form but not the substance of Item 215-A by substituting Item 215-B and group classification.

2. ICC No. S-96, publishing reduced rates on bituminous fine coal, in car loads, from mines to certain points in North Carolina, South Carolina, to Augusta, Georgia. The Tariff provided for a reduction of 25¢ per ton provided consignees received a minimum annual tonnage ranging from 400,000 to 1,000,000 tons. Effective date of Tariff was March 1, 1960. Under § 6(3) of the Act, 49 U.S.C.A. § 6(3), no change shall be made in railroad freight rates except after 30 days notice to the public and the ICC. The purpose of interval date is to give the public and the ICC opportunity to examine the proposed rates and to object.

3. The C. & O., The Interstate, The N. & W., and The Southern.

4. The Clinchfield, The L. & N., P. & N., and the Seaboard.

5. The order of investigation was to examine "into and concerning the lawfulness of the rates, charges, rules, regulations and practices contained in the schedules with a view of making such findings and orders in the premises as the facts and circumstances shall warrant."
Docket No. 33360: In re Southern Railway System (Southern Railway Company) Tariff ICC A-11352, Supplement 80; Southern Freight Association, Agent, Tariff ICC S-64, Supplements 8 and 9; Southern Freight Association, ICC S-96, and Supplements 1, 2 and 3; and, Southern Freight Association, Agent, ICC S-98 and Supplement 1.

6. In accordance with the ICC's Special Rules of Practice, 49 Code of Fed.Reg. 1.200(c).

7. A copy of the notice from the Secretary of the Commission is attached to the Briefs, since it was not included in the plaintiff's listing of the Record.

10, 1961, denied plaintiff's motion holding "The matters submitted in support thereof do not constitute substantial and material grounds to warrant granting said Motion;" and the ICC ordered "that said Motion be, and it is hereby overruled." Then by an order of April 27, 1961, issued May 4, 1961, the ICC denied plaintiff's Petition for Reconsideration "for the reason that upon consideration of the decisions of this Commission in Coal from Kentucky, Virginia and West Virginia, to Virginia, 308 ICC 99, and Coal to New York Harbor Area, 311 ICC 355, sufficient and material grounds have not been presented to warrant a conclusion, *without hearing*, that the Tariffs assailed herein are unlawful *per se*." (Emphasis added.)

Plaintiff seeks an injunction against the alleged unlawful agreed upon reduced rail transportation Tariffs and rates which, plaintiff avers, irreparably injures and will continue to injure it unless such Tariffs are restrained. Unless the injunctive process issues, plaintiff further avers, a designed purpose of the coal producers, rail carriers and coal consuming electric power companies will be accomplished, and plaintiff's continued sale of natural gas to Carolina Power and Light Company, for example, will not be made because such sales will thus have been rendered uneconomical. Certain other parties (Louisville & Nashville Railroad Company, Clinchfield Railroad Company, Southern Railway Company, The Cincinnati, New Orleans and Texas Railway Company, Interstate Railroad Company, Carolina Power and Light Company, Property Owners Committee and Association of Coal Mine Operators, and others) were allowed to appear and intervene in the case at bar.

Plaintiff's arguments for equitable relief are cast in the orthodox mold, viz.: irreparable harm will result from the ICC orders; the sought injunction will cause no injury or damage to others;

continued effectiveness of the filed Tariffs and rates will cause sales of natural gas to Carolina Power and Light Company to be uneconomical to plaintiff and destroy contractual arrangements entered by that company with plaintiff, with the resultant destruction of plaintiff as a competitor; and, finally, permitting the Tariffs to remain effective "is not in the public interest." In addition, plaintiff argues 1. it has no adequate remedy at law, and 2. it has exhausted its administrative remedies.

Plaintiff argues the reduced rates contained in the filed Tariffs are in violation of § 2 of the Interstate Commerce Act, 49 U.S.C.A. § 2; the law prior to and independent of the Act, and the law subsequent to the Act, require all shippers and consignees to be charged an equal rate; the ICC itself has held volume rates unlawful; and that the agreed upon volume reduced rates in SFTB Tariff 903, SFA ICC S–96 and SFTB Tariff 903–A, SFA ICC S–133 are, in addition, in violation of the Elkins Act, 49 U.S. C.A. § 41(1). The ICC and the Intervenors resist the issuance of an injunction and have moved to dismiss the complaint because of 1. failure to exhaust administrative remedies; 2. lack of standing to sue; and 3. lack of jurisdiction of this court to give the remedy sought in the complaint.

■ 1. The sole issue before the court is whether the present record, consisting mainly of the proceedings before the ICC, justifies utilization of the injunctive process. An examination has been had of the record before the ICC. The Interstate Commerce Act provides two methods of challenging the lawfulness of carrier-made rates: 1. said carrier rates may be attacked by filing a formal complaint with the ICC under 49 U.S.C.A. § 13(1); or 2. the Commission on its own motion, with or without a complaint, may investigate carrier-made rates under 49 U.S.C.A. § 15(7).[8]

---

8. This statute contains the discretionary suspension power of the ICC which is exercised before the effective date of new rates and is limited to a 7-month period. See, Luckenbach Steamship Company, Inc. v. United States et al.,

Regardless of which procedural path is followed—§§ 13(1) or 15(7) of the Act— the Commission cannot enter any orders as to challenged rates unless it follows the mandate of § 15(1) of the Act which requires a *full hearing*.[9] For example, (a) before the ICC may find the challenged rates produce unjust and unreasonable charges in violation of § 1(5) of the Act; or (b) the rates violate § 1(6); or (c) the rates produce unjust discrimination contrary to §§ 2 and 3; or (d) violate the tariff publishing provisions of § 6(1), the Commission pursuant to § 15(1) of the Act must conduct a *full hearing*.[10]

■ 2. The Commission has no power to do what plaintiff wants done, i. e., to make a summary finding that the rates, involved here, are unlawful per se

and require cancellation. Plaintiff must follow the statutory scheme under § 13 (1) of the Act if the lawfulness of the March 1, 1960 rates are to be challenged.

Recently this Court in Luckenbach Steamship Company v. United States and Interstate Commerce Commission, D.C. Del., 179 F.Supp. 605 (Biggs, C. J., Wright and Rodney, D. J.) had occasion to review an initial rate proceeding before the ICC. The Court held the initial proceedings before the ICC had not made any determination as to the lawfulness of the rates per se; consequently, these were discretionary matters interlocutory in nature against which the plaintiff there had not exercised its further administrative remedies, and, therefore, the orders of the ICC were not subject to review by the Court.[11]

---

D.C.Del., 179 F.Supp. 605, for the Commission's initial rate suspension procedure.

**9.** Thus, 49 U.S.C.A. § 15(1) states, in part:
"That whenever, *after full hearing, upon a complaint made as provided in section 13 of this part, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative,* either in extension of any pending complaint or without any complaint whatever, the *Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this part for the transportation of persons or property as defined in the first section of this part, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this part, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this part,* the Commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge or rates, fares, or charges, to be thereafter observed in such case, * * *." (Emphasis added.)

**10.** Under the Elkins Act, 49 U.S.C.A. § 41 (1) rail carriers are required to ob-

serve strictly their established tariffs "until changed according to law."

**11.** In Bison Steamship Company v. U. S., N.D.Ohio, 182 F.Supp. 63, 69, plaintiff sought to compel the ICC to reject lawfully published rates as unlawful per se because they violated the provisions of the Panama Canal Act, 49 U.S.C.A. § 5(14, 15). There, the Court decided: "Plaintiffs are not left remediless for they may still proceed under Section 13 (1) of the Interstate Commerce Act, 49 U.S.C.A. § 13(1)."

In pointing out the necessity for a party to exhaust its administrative remedies under the Interstate Commerce Commission Act, where rates are challenged, in Koppers Co. v. United States, W.D. Pa., 132 F.Supp. 159, p. 163 (Staley, C. J., and Gourley & Willson, D. J.), the court said:

"If the increased rates as applied to the plaintiff's particular situation can be shown to be unjust and unreasonable, its remedy is clearly by proceedings under Sections 13 and 15 of the Act for individual relief, and for reparation orders under the Act of Congress. 49 U.S.C.A. § 16(1); Brimstone R. & Canal Co. v. United States, 1928, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487; Alexander Sprunt & Son v. United States, 1930, 281 U.S. 249, 50 S.Ct. [314], 315, 74 L.Ed. 832; Eagle Cotton Oil Co. v. Southern R. Co., 5 Cir., 51 F.2d 443, certiorari denied 1931, 284 U.S. 675, 52 S.Ct. 130, 76 L.Ed. 571; Algoma Coal & Coke Co. v. United

In the case at bar, the rail carriers filed their rates (Tariffs) to become effective on March 1, 1960. As stated before, on February 25, 1960, the ICC entered an order of investigation into the lawfulness of the rates, but did not suspend the rates. They became effective on March 1, 1960 and have, in fact, been in effect for over a year and a half. On September 23, 1960 plaintiff for the first time appeared before the ICC and sought a declaration that the rates were unlawful and should be expunged. Plaintiff argued before the ICC that if the rates were unlawful, no hearing was required by the Commission to have them cancelled. On December 29, 1960 the ICC denied plaintiff's motion; on February 2, 1961 plaintiff filed a petition for reconsideration, to which the rail carriers, the Property Owners Committee, et al., replied. These and all other parties to the proceedings before the ICC (their No. 33360), except plaintiff here, filed a petition for discontinuance of the investigation. On April 27, 1961 the ICC denied plaintiff's petition for reconsideration, and on June 16, 1961 it entered an order discontinuing the proceeding.[12] There has never been a formal hearing before the Commission to determine the reasonableness of the rates. There is no final order of the ICC before this Court which adjudicates either the rights of all the parties or the lawfulness of the rates.[13] Manifestly this Court cannot do what the ICC could not do—reject or expunge the rates. Even if the rates were unlawful, still they are published rates.[14] § 6(6) of the Interstate Commerce Act, 49 U.S.C.A. § 6(6), deals with the filing of rates and tariffs with the ICC. The power given to the ICC to reject rates is specific, but limited. In brief, § 6(6) provides the schedules required shall be published, filed and posted in such form and manner as the ICC shall by regulation provide. The power to reject any schedule of rates is found in § 6(9) This is procedural regulation, as distinct from establishing a procedure to determine the substantive unlawfulness of the rates *per se*.[15] As stated, the question of cancellation of rates is controlled by § 15(1) of the Act which provides for a "full hearing." This means the ICC has no power to fix rates and no power to reject a rate without a hearing. Atchison, Topeka & Santa Fe Railway Company v. U. S., 232 U.S. 199, 221, 34 S.Ct. 291, 58 L.Ed. 568; Minnesota Rate Cases (Simpson etc. v. Shepard), 230 U.S. 352, 433, 33 S.Ct. 729, 57 L.Ed. 1511; Board of Trade of Kansas City v. U. S., 314 U.S. 534, 546–8, 62 S.Ct. 366, 86 L.Ed. 432; Federal Power Commission v. Pacific etc. Company, 307 U.S. 156, 160, 59 S.Ct. 766, 83 L.Ed. 1180. Likewise, the Federal District Courts cannot fix rates, nor relieve from refusal of the ICC to fix rates when there has been no full hearing before the administrative body.

States, D.C.E.D.Va., 1935, 11 F.Supp. 487. The plaintiff must proceed to exhaust its administrative remedies by challenging the rates filed by the railroads pursuant to the authorization granted it by the Commission in the ex parte proceeding."

12. The Luckenbach case, supra, appears similar. In Luckenbach the ICC simply refused to suspend the rates. It went ahead and ordered an investigation. The ICC, here, has done the same, acting under § 15(7) of the Act; it then discontinued the proceeding (apparently in accord not only with the plaintiff, but also at the request of all other parties to the proceeding).

13. In fact, at the hearing and argument on the temporary restraining order, the Court was informed plaintiff, here, had currently pending another petition before the ICC for reconsideration. See, D.C. Del., 200 F.Supp. 740.

14. See, Davis v. Portland Seed Company, 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762.

15. Even under the suspension provisions of the Act, § 15(7) (49 U.S.C.A. § 15 (7)); the ICC has power to suspend but only for 7 months in the case of new rates filed, and if the Commission has not completed its investigation at the end of the 7-months period, then the carrier has the right to put into effect the filed rates which shall control until after the full hearing has been had.

In National Water Carriers Ass'n v. United States, S.D.N.Y., 126 F.Supp. 87, 90, Judge Swann held:

"We also lack jurisdiction to grant the other form of relief asked by the plaintiffs, namely, to direct the Commission to enter an order declaring · unlawful the rates embodied in the supplemental tariff effective August 1, 1954. The plaintiffs' 'Protest and Petition' filed with the Commission on July 21, 1954 asked for 'summary rejection and elimination' of the proposed rates or, in the alternative, for suspension of them pending investigation of their lawfulness. The granting or denial of suspension of a proposed rate is discretionary with the Commission, 49 U.S.C.A. § 15 (7), and its refusal to suspend a rate is not judicially reviewable. Carlsen v. United States, D.C.S.D.N.Y., 107 F.Supp. 398. After denial of suspension the plaintiffs might have filed a formal complaint attacking the rates which went into effect on August 1st. They may still do so and the Commission must grant them a hearing. 49 U.S.C.A. §§ 13 (1), 15. Doubtless the Commission might have treated the plaintiffs' 'Protest' as a formal complaint and set the matter down for hearing, but it did not see fit to do so. This was an exercise of discretion with which we may not interfere. Nor are we asked to. What the plaintiffs ask is that the court declare the rates unlawful without waiting for the Commission to have a hearing and render an opinion as to their legality. This we may not do. The present application to the court is premature. The plaintiffs still have their administrative remedy of attacking the rates by formal complaint."

This is a good statement of the rule that the judicial function does not entitle one to judicial relief until the prescribed administrative remedy has been exhausted.[16]

■ 3. Plaintiff's status here lacks legal definition. It describes itself as a public utility engaged in the distribution and sale of natural gas. It is neither a shipper, a consignee of coal, nor a competitive carrier under the Act, directly affected by the reduced rates of rail carriers. Its relation to the rates filed by the rail carriers is, at best, oblique. Plaintiff's actual pinch of injury comes from its contracts with its power company customers to supply natural gas. The contracting parties chose to establish their original rates on the level of coal rates.[17] It would appear plaintiff·is a too distant party who lacks standing to maintain the instant action.[18] The fact

16. Director General of Railroads, et al. v. Viscose Company, 254 U.S. 498, 502–503, 41 S.Ct. 151, 65 L.Ed. 372, and cases cited therein; Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638; Macauley v. Waterman Steamship Corp., 327 U.S. 540, 544–45, 66 S.Ct. 712, 90 L.Ed. 839; Refrigerated Transport, Inc. v. United States et al., N.D.Tex., 101 F.Supp. 95; Holmes et al. v. United States, S.D.N.Y., 89 F.Supp. 894, affirmed 339 U.S. 927, 70 S.Ct. 628, 94 L.Ed. 1348, rehearing denied 339 U.S. 954, 70 S.Ct. 839, 94 L.Ed. 1367. Also see, Shannahan v. United States, 303 U.S. 596, 58 S.Ct. 732, 82 L.Ed. 1039; Rochester Tel. Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

17. It was known coal rates are not static. The contracts for the supply of natural gas envisaged this situation, i. e., gas rate would vary in accordance with the fluctuation of the coal rate.

18. In order to determine whether a party has standing, the exact nature of the interest of the party in the orders of the ICC must be ascertained. See, Seatrain Lines v. United States, D.C.Del., 152 F.Supp. 619, 622:

"A second basis advanced by Seatrain in support of its right to maintain this action is that after relief is denied at a rehearing of the Commission, the statute confers an unqualified right to bring an action in the appropriate court. A reading of the applicable statutory provision, 49 U.S.C.A. § 17(9), reveals that the provisions of law applicable in the

plaintiff was an intervenor in the administrative proceeding before the Commission does not of itself grant it the requisite "interest" to institute the present action in the district court.[19]

4. The ICC and the intervenors also argue the complaint in the case at bar fails to set forth a cause of action for which the present court has jurisdiction to afford a remedy. The

sought mandatory injunction is in the nature of a mandamus order directing the ICC to perform a discretionary act. Such an order ordinarily will not lie against such an agency.[20] Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 2 L.Ed.2d 788, recently reaffirmed this principle.[21] A district court does not exercise an administrative function.[22] Where there is discrimina-

case of suits to enforce, enjoin, suspend or set aside orders of the Commission govern the right to bring this action. In order to proceed under these applicable provisions of law, plaintiff must first establish its standing to use those provisions. The statutory provisions do not confer this right.

\* \* \* \* \*

"In order to determine whether Seatrain has standing, the exact nature of the interest of Seatrain in the exemption order must first be ascertained. \* \* "

19. Moffat Tunnel League v. United States, 289 U.S. 113, 119–20, 53 S.Ct. 543, 77 L.Ed. 1069; Pittsburgh & W. V. Ry. Co. v. United States, 281 U.S. 479, 50 S. Ct. 378, 74 L.Ed. 980; Atchison, T. & S. F. Ry. Co. v. United States, E.D.Mo., 130 F.Supp. 76, 78, aff'd mem., 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785; Jersey City v. United States, D.C.N.J., 101 F. Supp. 702, 703; Pennsylvania R. Co. v. United States, W.D.Pa., 40 F.2d 921, 925.

And, on status, see E. Brooke Matlack, Inc. and Coastal Tank Lines, Inc. v. United States, D.C.E.D.Pa., 195 F.Supp. 399 (CA 28670, June 15, 1961) where the three-judge district court held two competing motor carriers had no standing to maintain an action against an order of the ICC which denied a petition seeking an order declaring that a certain permit possessed by a third motor carrier had been revoked.

20. Interstate Commerce Commission v. United States, 260 U.S. 32, 43 S.Ct. 6. 67 L.Ed. 112; Wilbur v. United States, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809; Chicago Great Western Railway Co. v. Interstate Commerce Commission, 294 U.S. 50, 55 S.Ct. 326, 79 L.Ed. 752; United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 57 S.Ct. 855, 81 L.Ed. 1272; Work v. U. S. ex rel. Rives, 267 U.S. 175, 177–178, 45 S.Ct. 252, 69 L.Ed. 561.

21. At p. 318, at p. 757 of 78 S.Ct.:
"\* \* \* The principle at stake is no different than if mandamus were sought —a remedy long restricted, Marbury v.

Madison, 1 Cranch 137, 166 [2 L.Ed. 60]; Decatur v. Paulding, 14 Pet. 497, 514–517 [10 L.Ed. 559], in the main, to situations where ministerial duties of a nondiscretionary nature are involved. Where the matter is peradventure clear, where the agency is clearly derelict in failing to act, where the inaction or action turns on a mistake of law, then judicial relief is often available. \* \* \* But where the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion. See Work v. [United States ex rel.] Rives, 267 U.S. 175, 183 [45 S. Ct. 252, 254, 69 L.Ed. 561]; Wilbur v. [United States ex rel.] Kadrie, 281 U.S. 206, 219 [50 S.Ct. 320, 324, 74 L.Ed. 809]; United States ex rel. Chicago Great Western R. Co v. Interstate Commerce Commission, 294 U.S. 50, 62–63 [, 55 S.Ct. 326, 331, 79 L.Ed. 752]. We then must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision."

22. Federal Power Commission v. Idaho Power Commission, 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15:
"A federal court cannot fix rates, nor make divisions of joint rates, nor relieve from the long-short haul clause \* \* \*."
Federal Power Commission v. Pacific Power & Light Co., 307 U.S. 156, 160, 59 S.Ct. 766, 768, 83 L.Ed. 1180; Peik v. Chicago N. W. R. Co., 94 U.S. 164, 24 L.Ed. 97; Reagan v. Farmers' Loan & T. Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014; Simpson v. Shepard (Minnesota Rate Cases), 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511; Louisville & N. R. Co. v. Garrett, 231 U.S. 298, 34 S.Ct. 48, 58 L.Ed. 229; Loomis v. Lehigh Valley R. Co., 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517; Atchison, T. & S. F. Ry. Co. v. United States, 232 U.S. 199, 221, 34 S.Ct. 291, 58 L.Ed. 568; Terminal R. Ass'n v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150.

tion, it is for the Commission to find it and to determine whether the discrimination is unlawful.[23]  The Commission in the instant proceeding by its order of April 27, 1961 [24] stated its action was without prejudice to the right of plaintiff, here, to challenge the lawfulness of the involved rates in a proceeding in accordance with § 13 of the Act and the Commission's General Rules of Practice.[25]

For each, and all, of the four reasons discussed, supra, the motions of defendants and intervenors to dismiss the complaint should be granted.

23.  See, Barringer & Co. v. United States, 319 U.S. 1, 7–8, 63 S.Ct. 967, 87 L.Ed. 1171 (cases cited) ; United States v. Wabash R. Co., 321 U.S. 403, 411, 64 S. Ct. 752, 88 L.Ed. 827.

24.  Appendix 2, Order of April 27, 1961.

25.  Appendix 4, Secretary McCoy's letter of July 26, 1961.